[S.F. No. 23668. Oct. 25, 1978.]

TOWARD UTILITY RATE NORMALIZATION, Petitioner, v.
PUBLIC UTILITIES COMMISSION et al., Respondents;
PACIFIC TELEPHONE AND TELEGRAPH COMPANY et al.,
Real Parties in Interest.

**COUNSEL**

Ann Murphy and Antonio Rossmann for Petitioner.

Janice E. Kerr, Hector Anninos and Robert T. Baer for Respondents.

Robert V. R. Dalenberg, Margaret deB. Brown and Christopher Lee Rasmussen for Real Parties in Interest.

**OPINION**

**RICHARDSON, J.**—We consider whether the Public Utilities Commission (Commission) has properly exercised its power and fulfilled its statutory obligations in ordering the implementation of a new method of measuring and assessing charges for local telephone service usage. (*Pacific Telephone & Telegraph Co.* (1977) 82 Cal.P.U.C. 162 (Dec. No. 87584).) We conclude that it has.

Toward Utility Rate Normalization (TURN) is a nonprofit corporation organized under the laws of the State of California to represent, principally before Commission, the interests of residential consumers generally and specific consumer oriented organizations and constituencies.

At all times herein relevant real party in interest Pacific Telephone and Telegraph Company (Pacific), in the major metropolitan areas of California offered three types of residential telephone service: (1) a 60-local-message-unit allowance at $3.75 per month prior to 1974 (1 "message unit" was charged for each local telephone call made); (2) a

30-local-message-unit allowance (termed "lifeline" service, and intended for those with limited incomes) at $2.50 per month; and (3) a flat rate service allowing an unlimited number of local calls at $5.70 per month. Pacific imposed an $11 "regrade" charge on those residential customers who changed from one type of service to another. Business customers were billed in accordance with the number of message units they used.

We describe in sequence certain relevant actions by petitioner, the Commission and Pacific. On July 23, 1974, the Commission issued its Decision No. 83162 (77 Cal.P.U.C. 117) which added a time factor to local billing by ordering Pacific, inter alia, to measure or account for local calls made by subscribers to Pacific's message unit services in increments of one message unit for each five minutes of usage or fraction thereof. In explaining its reasons for approving this innovative rate design concept the Commission said as follows: "The reason for instituting the timing of local messages is that the present rate structure fails to make any allowance for the fact that a customer who makes a five-minute call is charged one message unit at 4.5 cents whereas another customer who makes a six-hour call over the same route is also charged one message unit at 4.5 cents. Business customers' holding times on a single call may in some cases last for an entire business day. Some residence customers also have extremely long duration calls. Under present pricing arrangements long duration calls cost only 4.5 cents on message rate service." (P. 174.) This usage-sensitive rate design is known as single-message-rate timing (SMRT).

In Decision No. 83162 the Commission also found that while the present exchange message unit rate was 4.5 cents the evidence elicited at a hearing indicated that the cost to Pacific of an average local message was approximately 5 cents for approximately 4 minutes. The Commission in its decision therefore authorized Pacific to charge a message unit rate of 5 cents.

The Commission further required that the timing equipment to be installed by Pacific possess a capability for off-peak pricing. The periods of off-peak service were defined as during the hours of 11 p.m. to 8 a.m. daily and 8 a.m. to 5 p.m. on Sundays and holidays. However, the Commission delayed any differential treatment of on-peak and off-peak calls. Pacific did not have available the machinery necessary to provide on- and off-peak pricing and thus was unable to commence implementation of SMRT until March 29, 1976, when the new rate design was

introduced in the eastern portion of the San Francisco Bay Area and in Orange County.

June 7, 1976, in response to a separate general rate increase application filed by Pacific, the Commission staff sought an expedited interim order eliminating SMRT from lifeline service. On June 23, 1976, TURN, petitioner in the present proceeding, filed its motion for an expedited interim order eliminating SMRT from measured rate residential services generally. Thereafter, SMRT was instituted in San Diego, and appearances on the issue of SMRT were filed by numerous public and private entities including TURN.

On August 18, 1976, the Commission issued Decision No. 86248 (*Pacific Telephone & Telegraph Co.* (1976)) ordering that Pacific not institute single message rate timing for residential telephone service in any areas other than those where it was in operation as of the effective date of the order, pending further order on the subject by the Commission. Thus, implementation of SMRT was halted just prior to the date, August 22, 1976, that it was scheduled to commence in the western portion of the San Francisco Bay Area. However, Pacific completed the implementation of SMRT for business measured rate service in the San Francisco-East Bay, San Diego, Orange County, and the Los Angeles extended areas.

November 2, 1976, the Commission issued its Decision No. 86594 (*Pacific Telephone & Telegraph Co.* (1976) 80 Cal.P.U.C. 621) terminating existing residential SMRT within five days of the decision and requiring Pacific to waive regrade charges until June 30, 1977.

Thereafter, on July 12, 1977, after holding public hearings, the Commission issued its Decision No. 87584 which is the subject of the present dispute. This decision eliminated SMRT as to the 30-message-unit-lifeline service but retained it as to the 60-message-unit service for residential and business use. The decision also changed the measure for timing these calls so that overtime periods (beyond the five-minute base allowed per message unit) were to be measured in one-minute increments charged at 1 cent per minute rather than in five-minute increments as previously provided. The Commission further found that SMRT should include off-peak incentives in the form of the removal of timing from 5 p.m. to 8 a.m. on weekdays and all day on Saturdays, Sundays, and holidays. There was an additional order waiving

regrade charges for those users changing their residential services during the 90 days following the effective date of the decision. However, the Commission did not order that past regrade charges be refunded.

Before considering the principal issues herein we dispose of a preliminary matter. TURN did not file any application for rehearing of Decision No. 87584 but did file with us its petition for writ of review on August 11, 1977. The Commission and Pacific argue that TURN's petition is premature since it should have filed an application for rehearing before the Commission after Decision No. 87584 was issued. (Pub. Util. Code, §§ 1732, 1756; all code references hereafter are to this code unless otherwise cited.)

■ We find no merit in the Commission's contention that this matter is not properly before us because TURN is obliged to seek rehearing of the decision under dispute. The concept and application of SMRT has been worked and reworked by the Commission through a series of decisions first starting in July 1974. The presently disputed decision was itself rendered after a petition for rehearing was filed by both Pacific and TURN.

SMRT was first ordered implemented by a decision of the Commission in July 1974. Because the necessary machinery was not immediately available, SMRT was not actually instituted until March 1976. In June 1976 TURN filed a motion seeking to eliminate SMRT from residential service, the same end it seeks in the present hearing. The Commission took briefs in the matter and, after first staying further implementation of SMRT as of August 1976, ordered it eliminated in November 1976. However, the Commission then granted rehearing of its decision to eliminate SMRT and ultimately, by the decision presently under consideration, reversed itself again and ordered implementation of SMRT to 60-message-unit customers.

We find no statutory requirement that TURN seek rehearing of a decision following rehearing. Neither section 1731 nor section 1756 makes any mention of rehearings of decisions on rehearing. Section 1756 does not seem to contemplate it. The section states: "Within 30 days after the application for a rehearing is denied, or, if the application is granted, then within 30 days after the decision on rehearing, the applicant may apply to the Supreme Court of this State for a writ of certiorari or review for the purpose of having the lawfulness of the original order or decision

or of the order or decision on rehearing inquired into and determined." Indeed, section 1756 implicitly appears to foreclose an application for rehearing of a decision on rehearing.

In the present case the argument to eliminate SMRT was first presented by TURN in its brief of August 10, 1976. SMRT was thereafter temporarily eliminated and has subsequently been reinstated in a modified form. Throughout all these proceedings the issues have remained constant and have been considered repeatedly by all parties. We treat petitioner's administrative remedies as having been exhausted and its petition as properly before us.

1. *Commission Compliance With Public Utilities Code Section 1705*

TURN contends that Decision No. 87584 fails to comply with the requirements of section 1705 which states in relevant part: "After the conclusion of the hearing, the commission shall make and file its order, containing its decision. . . . [T]he decision shall contain, separately stated, findings of fact and conclusions of law by the commission on all issues material to the order or decision." Petitioner does not challenge the soundness of the Commission's reasoning set forth in its decision, but contends that its findings do not support its order.

The scope of our review of a Commission decision is described in section 1757: "The review shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the Constitution of the United States or of this State. [¶] The findings and conclusions of the commission on questions of fact shall be final and shall not be subject to review except as provided in this article." There is a strong presumption favoring the validity of a Commission decision. (*Greyhound Lines, Inc.* v. *Public Utilities Com.* (1968) 68 Cal.2d 406 [67 Cal.Rptr. 97, 438 P.2d 801]; *Market St. Ry. Co.* v. *Railroad Com.* (1944) 24 Cal.2d 378, 399 [150 P.2d 196], affd. 324 U.S. 548 [89 L.Ed. 1171, 65 S.Ct. 770]; *Western Canal Co.* v. *Railroad Commission* (1932) 216 Cal. 639, 645-646 [15 P.2d 853].)

Further, we have held that the findings of fact by the Commission are to be accorded the same weight that is given to jury verdicts and the findings are not open to attack for insufficiency if they are supported by any reasonable construction of the evidence. (*Pacific Gas & Electric Co.* v.

*Devlin* (1922) 188 Cal. 33, 40 [203 P. 1058].) Moreover, as we observed in *City of Los Angeles* v. *Public Utilities Commission* (1972) 7 Cal.3d 331 [102 Cal.Rptr. 313, 497 P.2d 785], "When conflicting evidence is presented from which conflicting inferences can be drawn, the commission's findings are final." (P. 351.)

▪ Our examination of Decision No. 87584 reveals that the findings of fact and conclusions of law set forth therein are sufficient to meet the requirements of section 1705 and enable us to determine that the Commission has properly exercised its authority and has not acted arbitrarily in ordering the implementation of usage-sensitive billing on local telephone services.

Decision No. 87584, preliminarily, recites a full procedural history tracing the actions that have been taken involving SMRT. The Commission then describes its reasons for authorizing the implementation of SMRT as modified. It first notes that although a common belief exists that the cost of providing local telephone service is nominal, in fact local telephone service utilizes relatively high cost wire circuitry compared to the microwave transmission which is increasingly used for toll calls. The Commission then observes that since Pacific traditionally designs its system to leave an adequate margin for peak period capacity, a slowdown in the growth in peak period calling volumes will reduce the necessary expenditure for construction of local telephone exchange facilities. This, in turn, permits the elimination of unnecessary expansion with attendant savings in costs and further results in the conservation of natural resources such as the copper, lumber, and other building material normally consumed by new plant and equipment acquisition. The ultimate result is a saving to rate payers.

In addition to the goal of reducing the growth in peak period calling volume, the Commission also states that, by adopting SMRT, it sought to distribute the cost of telephone service more equitably among telephone service users, permitting those with the greater telephone use to pay proportionately more for their service. The Commission decision states that, "It is our long range goal to implement SMRT for all of Pacific's subscribers, both residential and business, in at least Pacific's metropolitan and mini-metropolitan rate areas" (*Pacific Telephone & Telegraph Co., supra,* 82 Cal.P.U.C. 162,165 (Dec. No. 87584)), while acknowledging that by reason of equipment shortages a number of years would be required for full implementation.

The Commission orders that SMRT not be applied to lifeline service. While this was a change from its initial position the reasons were clearly stated. There had been considerable testimony presented to the Commission which indicated that lifeline service should remain untimed as a matter of social policy because of the critical needs of the important segment of society for which lifeline service was expressly designed. In order to slow the increase of telephone service during peak hours the Commission ordered that SMRT should include off-peak incentives in the form of removal of timing from 5 p.m. to 8 a.m. on weekdays and all day on Saturdays, Sundays, and holidays. The Commission ordered SMRT continued for 60-message-unit-allowance service and business service.

At the conclusion of its lengthy discussion of the background for the ordered tariff changes the Commission lists 15 "findings of fact," closing with the 2 conclusions to which TURN takes particular exception: "14. The increases in rates and charges and the other tariff charges authorized herein are justified. [¶] 15. The rates, charges, and other tariff changes authorized herein are just and reasonable, and present rates and charges, insofar as they differ therefrom, are for the future unjust and unreasonable." (Dec. No. 87584, p. 18.)

Alleging that these two findings of fact are "The only findings that support the imposition of SMRT on 60 measured rate service . . . ," TURN then contends that because flat-rate customers rather than the 60-message-unit customers allegedly make the longest telephone calls, the Commission abused its discretion in ordering SMRT to be implemented as to the latter group. The contention lacks merit.

Sixty-message-unit customers pay a lower monthly rate than flat-rate customers ($3.75 and $5.70, respectively). Accordingly, it is not necessary to provide the two classes of customers with precisely the same form of service. Further, as the Commission notes, it may be years before Pacific will have equipment capacity fully to implement SMRT. Flat rate customers represent approximately 80 percent of residential customers, with 60-message-unit customers constituting only 11 percent of residential customers. It is not unreasonable for the Commission, in ordering the implementation of SMRT, to proceed initially with the group that Pacific can most efficiently handle with its available billing equipment, namely, 60-message-unit customers. In addition, as various witnesses before the Commission noted, it is important for Pacific to obtain experience with

SMRT in order to determine its effect on customer usage patterns and on the utility generally. A gradual phasing in of this new tariff system will allow Pacific to acquire this experience, meantime permitting customers normal and reasonable usage. It is within the discretion of the Commission, as part of a long range changeover in billing procedure, to implement a usage sensitive method of billing customers who choose to subscribe to that particular service. We note that customers may, without regrade charge for a period of 90 days, choose to change service to another more economically advantageous form, or to modify their use to avoid any increase in charges. The latter option may be accomplished merely by limiting the duration of their on-peak local telephone calls to five minutes. If customers choose not to do this, then SMRT will provide that they pay only their fair share of the cost of the telephone service as determined by the extent to which they use it.

Clearly, the Commission in the present case has done far more than describe its bare-bones conclusory findings in the manner which we held insufficient in *Greyhound Lines, Inc.* v. *Public Utilities Com.* (1967) 65 Cal.2d 811 [56 Cal.Rptr. 484, 423 P.2d 556], and *California Motor Transport Co.* v. *Public Utilities Com.* (1963) 59 Cal.2d 270 [28 Cal.Rptr. 868, 379 P.2d 324]. On the contrary, in the present case we have been apprised of the reasoning behind and the basis for the Commission's decision to order implementation of SMRT. We conclude that the Commission's decision was well founded in practicality, being based upon the reasonable policy that those most heavily using the telephone network should pay proportionately more for their service, a principle that is almost uniformly applied in the rate designs for gas, electricity, and water service.

We observe that the decision in question contains a lengthy discussion of the background of the proposed change in addition to the 15 findings of fact. These findings are themselves, of course, distilled from the testimony of the numerous witnesses who testified before the Commission. (In the return to the writ of review and the memorandum of documents 550 items are listed, including over 7,000 pages of testimony taken before the Commission.) We have never held that an administrative decision must contain a complete summary of all proceedings and evidence leading to the decision. Rather we have repeatedly (*Greyhound, California Motor*) set as our standard a statement which will allow us a meaningful opportunity to ascertain the principles and facts relied upon by the Commission in reaching its decision. We conclude, in short, that the Commission has complied with the requirements of section 1705.

## 2. *Adequacy of Representation*

■ Petitioner contends that the Commission failed adequately to represent the people of California because it neglected to obtain answers to numerous questions regarding the cost and revenue effect of SMRT before implementing SMRT and because it did not develop its own independent cost study of SMRT. Our examination of the record reveals no basis for this complaint.

Petitioner lists 20 questions which, it contends, must be answered before the Commission may institute the SMRT rate reform on any residential service. An examination of these questions, however, reveals that only practical experience with SMRT would provide the required answers. Particularly, such questions as "What is the impact of SMRT on revenues?" and "What will be the shifts in usage if SMRT with off-peak pricing is implemented?" can be answered only by hard data drawn from actual usage rather than from mere speculation. The Commission itself has earlier acknowledged this fact. "Theories as to the most appropriate rate design in a given industry are generally the products of experience and experimentation over time. These matters involve questions of basic policy which cut across the lines of particular cases and which are not susceptible to precise measurement or testing as to their effects, either environmentally or otherwise, in a given proceeding . . . . [¶] It is for this basic reason that changes in rate design are best left to a process of orderly evolution on a case-by-case approach, in order that the effects over time can be properly evaluated and the prevailing theories tested before being strictly and comprehensively applied." (*Peninsula Commute and Transit Committee* (1973) 75 Cal.P.U.C. 243, 247.)

We also note that Decision No. 87584 is only an interim order within a general rate proceeding. The decision orders Pacific to file a report showing the estimated annual revenue effect (on a test-period basis) that would result from the rate modifications it ordered. Such a report is to be filed within 15 days of the effective date of the decision. The Commission will be able to consider the revenue impact in issuing its final order on SMRT.

TURN further argues that the Commission was remiss in not developing its own cost study of SMRT, noting that the Commission's decision recites that, "The Staff, because of time and manpower constraints, did not develop its own cost study." (Dec. No. 87584, p. 8.) TURN construes

this statement as an admission of the Commission's inability adequately to evaluate the SMRT cost factors. The statement, however, refers only to a study of the lifeline service which Pacific had argued was a subsidized service thereby properly subject to SMRT. The Commission acknowledged that while it had not done a separate study to rebut Pacific's allegation of subsidy, as a policy matter it would order that lifeline service be exempt from SMRT. There is no basis for concluding from the foregoing that the public was inadequately represented because of the absence of a cost study as to lifeline service.

TURN specifically contends that the Commission ignored "the mandate of Article XII of the California Constitution and Sections 307 and 454 of the California Public Utilities Code," but no explanation is made as to the basis for TURN's argument that the Commission has violated either the Constitution or section 307 or how the Commission abdicated its responsibilities thereunder.

■ As to section 454 petitioner contends that "SMRT results in nothing more than automatic rate increases with no justification that such rates are just and reasonable." Section 454 provides in pertinent part: "(a) No public utility shall raise any rate or so alter any classification, contract, practice, or rule as to result in any increase in any rate except upon a showing before the commission and a finding by the commission that such increase is justified . . . ." As we have previously noted, an extensive showing was made before the Commission that over a period of years SMRT would provide the fairest method of billing for telephone service and would cause a shift of telephone usage to off-peak hours. The Commission found in Decision No. 87584 that it deemed SMRT to be a desirable tariff method and that the resulting rates and charges were reasonable. This would appear to satisfy the requirements of section 454.

### 3. *Equal Protection of Customers of Different Utilities*

■ Petitioner further asserts that Decision No. 87584 results in a denial of equal protection to customers served by General Telephone Company of California (General) in that although it provides for on- and off-peak pricing for customers of Pacific, there is no mention of how the pricing for General will be resolved.

General provides measured rate (message unit) residential and business service both of which are subject to SMRT. Because of a lack of the

necessary equipment, however, General is unable to provide for on- and off-peak pricing.

TURN alleges that the failure of the Commission to require General to provide off-peak pricing results in discriminatory rates which constitute a violation of the equal protection clauses of the United States and California Constitutions, and of sections 451, 453, and 728. TURN's analysis of the matter is incorrect, and we conclude that no denial of equal protection occurs merely because General does not provide off-peak pricing, and the statutory provisions are not violated.

The sections cited by TURN provide in relevant part: 451: "All charges demanded or received by any public utility, . . . for any product or commodity furnished . . . shall be just and reasonable. . . ." 453, subdivision (c): "No public utility shall establish or maintain any unreasonable difference as to rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service." 728: "In determining . . . rates for a telephone corporation . . . the commission shall, . . . take into consideration . . . the permissible rates for comparable service charged by telephone corporations in adjacent territory."

A reading of these sections in conjunction reveals that the Commission may reasonably allow contiguous utilities to use different methods of billing and charge different rates if there is a rational basis for so doing.

In this case, the evidence is undisputed that General does not have the necessary equipment to duplicate the billing system which Pacific is implementing. It is undeniably a reasonable exercise of the Commission's discretion to order an on- and off-peak pricing structure for Pacific which has the equipment to implement such a tariff system, but to allow General to apply SMRT 24 hours a day.

TURN fails to acknowledge that the Commission's decision seeks to fulfill two legitimate goals: (1) a shift to off-peak usage; and, equally important, (2) a fair apportionment of the cost of telephone service among users of the service. SMRT, even if applicable 24 hours a day, will help achieve the second goal.

As we noted in *People* v. *Olivas* (1976) 17 Cal.3d 236, at page 243 [131 Cal.Rptr. 55, 551 P.2d 375], "We have in a number of past decisions

described and applied the test most frequently employed by the United States Supreme Court in reviewing legislative classifications under the equal protection clause. ' "In the area of economic regulation, the high court has exercised restraint, investing legislation with a presumption of constitutionality and requiring merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose. [Citations.]" ' "

It is apparent that the distinction made between the customers of Pacific and General bears a rational relationship to legitimate Commission goals and is a result of a proper and constitutional exercise of the Commission's discretion.

### 4. Refund of Regrade Charges

In February 1976 Pacific voluntarily waived the $11 regrade charge for residential customers changing from message unit service to flat rate service in those metropolitan areas undergoing conversion to SMRT. This was to minimize the impact of SMRT on those measured rate residence customers who might experience an increase in their telephone bill due to timing by allowing them to change to another form of service without charge.

By Decision No. 86594, effective November 8, 1976, the Commission eliminated all residential SMRT procedures and ordered Pacific to waive *all* regrade charges so that customers could once again reassess their options without penalty. The effect of the order, however, was to eliminate all regrade charges on residential regrade anywhere in Pacific's service territory, whether such regrade was related to SMRT or not.

By Decision No. 86602 (*Pac. Tel. & Tel. Co.* (1976) 80 Cal.P.U.C. 716) the Commission extended the effective date of Decision No. 86594. Pacific's subsequent petition for rehearing had the effect of staying Decision No. 86594 and returning the status of regrade charges to that previously established by Pacific, i.e., waiver from measured to flat service only in those affected areas.

Decision No. 87584 invalidates the extension of time and at the same time acknowledges the Commission's error in ordering an across-the-board waiver of regrade charges. The decision states, however, that since confusion had undoubtedly been engendered about SMRT it would

order a total waiver of regrade charges for a limited period of 90 days so that customers could select the service best suited for them in the light of the Commission's new order regarding SMRT.

The decision does not order that past regrade charges be refunded and petitioner contends that the Commission's failure to order a refund of all regrade charges collected since November 8, 1976, results in an illegal confiscation of the affected ratepayers' monies. A close examination of the admittedly confusing sequence of events indicates that this is not the case. Decision No. 86594, effective November 8, 1976, provided for a *waiver* of future regrade charges. It did not provide either for a refund of past collected regrade charges or for any other refund. Decision No. 86678 (*Pac. Tel. & Tel. Co.* (1976) 80 Cal.P.U.C. 785), dated November 23, 1976, granted rehearing of the decision providing for waiver and thereby stayed all waivers. On November 30, 1976, TURN petitioned for a modification of the grant of rehearing requesting, inter alia, that all residential regrade charges collected since November 2, 1976, be subject to refund. This petition for modification was denied.

A waiver of regrade charges in whatever form is completely discretionary with the Commission. The Commission may order one-way waiver (for changes from 60-message unit to flat rate), two-way waiver (either way between 60-message unit and flat rate) or decline to order any waiver at all. In the present case the Commission purposely declined to make regrade charges subject to refund. Because the Commission had the authority to refuse to order any waiver at all, its actions cannot be deemed to have resulted in an illegal confiscation of taxpayers' monies.

Decision No. 87584 is affirmed.

Tobriner, J., Clark, J., and Manuel, J., concurred.

**MOSK, J.**—I dissent.

The convoluted history of the Public Utilities Commission's adoption of single message rate timing (SMRT) is a seemingly endless series of false starts, second thoughts, and reversals which does little credit to the administrative process.[1] From this welter of indecision, however, there

---

[1] As the majority point out (*ante*, pp. 544-545), in the matter under review the commission is even compelled to rule illegal one of its own decisions (No. 86602) rendered earlier in

has now emerged at least one clear result: ratepayers who subscribe to the limited service of 60 local message units per month are to be the guinea pigs in the SMRT experiment. Although these ratepayers constitute but 11 percent of residential customers, the decision under review makes them the only such customers to be charged according to a scheme conceded by the commission to be "radical and distasteful" to many persons. Not surprisingly, the commission wholly fails to justify this rank discrimination: as will appear, I disagree with the majority's conclusion that the decision is supported by the specific findings of fact required both by statute and by settled case law.

We are the exclusive state court with jurisdiction to review commission decisions. (Pub. Util. Code, § 1759.)[2] In such review our function is to examine "whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the Constitution of the United States or of this State." (§ 1757.) Among the steps which the commission must take in order to "regularly pursue its authority" is compliance with the statutory mandate that each of its decisions "shall contain, separately stated, findings of fact and conclusions of law by the commission on all issues material to the order or decision." (§ 1705.) Petitioner makes a convincing showing that this statute was violated in the case at bar.

The requirement of specific findings of fact and conclusions of law was added to section 1705 in 1961. We first construed and applied this statute in *California Motor Transport Co.* v. *Public Utilities Com.* (1963) 59 Cal.2d 270 [28 Cal.Rptr. 868, 379 P.2d 324]. There, the commission issued a certificate of public convenience and necessity to a trucking firm, but its decision recited only the ultimate finding of such convenience and necessity. Speaking through then Associate Justice Traynor, the court held that "Every issue that must be resolved to reach that ultimate finding is 'material to the order or decision' " within the meaning of section 1705. (*Id.*, at p. 273.) Because the commission had failed to make separate findings on ·each of the basic facts supporting the ultimate finding of convenience and necessity, we unanimously annulled the decision.

---

this "admittedly confusing sequence of events . . . ." (See also finding 8, fn. 4, *post.*) Nor is the end of this byzantine tale in sight: the commission entitles the present decision its "Fifth Interim Opinion on Rehearing," and warns that it "may not be our final resolution on how SMRT should be implemented."

[2]Unless otherwise specified, all statutory references herein are to the Public Utilities Code.

Our opinion in *California Motor Transport* listed a number of compelling reasons for the requirement of specific findings of fact. (*Id.,* at pp. 274-275.) These reasons have repeatedly been invoked in later cases, and were summarized as follows in *Greyhound Lines, Inc.* v. *Public Utilities Com.* (1967) 65 Cal.2d 811, 813 [56 Cal.Rptr. 484, 423 P.2d 556]: "such findings afford a rational basis for judicial review and assist the reviewing court to ascertain the principles relied upon by the commission and to determine whether it acted arbitrarily, as well as assist parties to know why the case was lost and to prepare for rehearing or review, assist others planning activities involving similar questions, and serve to help the commission avoid careless or arbitrary action." (Accord, *City of Los Angeles* v. *Public Utilities Commission* (1972) 7 Cal.3d 331, 337 [102 Cal.Rptr. 313, 497 P.2d 785]; *Southern Pacific Co.* v. *Public Utilities Com.* (1968) 68 Cal.2d 243, 244 [65 Cal.Rptr. 737, 436 P.2d 889]; *Associated Freight Lines* v. *Public Utilities Com.* (1963) 59 Cal.2d 583 [30 Cal.Rptr. 466, 381 P.2d 202].)[3] In each of the cited cases we unanimously annulled a commission decision for failure to separately state findings on all facts necessary to support the ultimate finding, e.g., of public interest, necessity, or convenience.

The decision under review contains 15 purported "findings of fact."[4] Of these, only findings 14 and 15 even arguably support the imposition of SMRT on 60-message-unit subscribers; but because items 14 and 15 are no more than statements of the ultimate finding that the new rates are "just and reasonable," they cannot alone satisfy the requirements of the foregoing case law.

---

[3]The several purposes served by the findings requirement of section 1705 are strikingly similar to those underlying the requirement (Code Civ. Proc., § 657) that a trial court specify its reasons for granting a new trial. (See *Mercer* v. *Perez* (1968) 68 Cal.2d 104, 113-114 [65 Cal.Rptr. 315, 436 P.2d 315].)

[4]"1. SMRT should not be applicable to lifeline residence telephone service. However, it may be reasonable to charge a premium for messages in excess of the 30-message allowance. We will require Pacific to study this or similar plans.

"2. The initial period for business and residence measured service should continue to be priced at five cents for the first five minutes of use or fraction thereof.

"3. We find that the present SMRT plan wherein overtime usage is charged in five-minute increments for usage beyond the initial period is unreasonable. A reasonable plan is to charge residential and business subscribers on a per-minute basis for overtime use. It is reasonable to reduce the present one message unit (5 cents) for five minute overtime rate to one-fifth message unit (one cent) for one minute of overtime use.

"4. We find that to promote efficient use and conservation of communications facilities SMRT should include off-peak incentives in the form of removal of timing from 5:00 p.m. to 8:00 a.m. on weekdays and all day on Saturdays, Sundays, and holidays.

To support the commission's action, accordingly, it would have been necessary for items 1 through 13 to contain findings on the basic facts upon which the ultimate finding was predicated. Findings 1 through 13, however, are plainly devoid of any basic facts relevant to the reasonableness of or justification for ordering Pacific to impose SMRT on 60-message-unit subscribers. Thus findings 1 and 12 concern 30-message-unit (lifeline) service only. Finding 2 expresses the commission's view that the price of an initial message unit should remain at five cents, and finding 3 states the commission's conclusion that SMRT charges ought to be based on one-minute rather than five-minute increments. Finding 4 recites that SMRT will be removed during off-peak hours as an incentive to use of the telephone system in that period. Findings 5 through 10 relate only to regrade charges and refunds. Finding 11 is

"5. In order that residential subscribers may select the service consistent with their requirements, in view of these late modifications, it is reasonable to waive charges for the regrade of residence service in the SMRT areas for 90 days after the rates herein become effective. Pacific should notify the affected subscribers of these rate changes and the regrade waiver.

"6. The residential SMRT revenues held by Pacific, subject to refund pursuant to Ordering Paragraph No. 4 of Decision No. 86678, should be returned. Pacific should submit a proposed refund plan within 30 days for the Commission's approval.

"7. When the revenue requirement was last determined for Pacific in Decision No. 85287, Application No. 55214, dated December 30, 1974, the Commission did not recognize estimated annual revenues to be derived from SMRT.

"8. Decision No. 86602 dated November 8, 1976 unlawfully modified Decision No. 86594. The rates authorized by Decision No. 86594 are the rates that were lawfully applicable.

"9. Refunds that are to be made to residential subscribers subject to SMRT should be calculated from November 8, 1976 (the date that SMRT was reinstituted on residential subscribers following Decision No. 86602).

"10. Pacific should file a refund plan for the Commission's approval to refund SMRT revenue collected from residential subscribers from November 8, 1976 through November 23, 1976. (November 23, 1976 was the date that all residential SMRT revenue was made subject to refund.) Pacific shall file that refund plan as well in conjunction with its plan to refund residential SMRT rates collected after November 23, 1976 (pursuant to Decision No. 86678).

"11. We will consider the annual test year revenue effect of the SMRT rate modifications ordered herein when we establish Pacific's revenue requirement in this proceeding. Pacific should be directed to present the estimated annual test year revenue effect of this order within 15 days.

"12. Pacific and the staff should submit evidence on possible modifications to lifeline service to prevent abuse of that service.

"13. It is unreasonable to establish discounted or special SMRT rates for nonprofit or charitable business subscribers.

"14. The increases in rates and charges and the other tariff changes authorized herein are justified.

"15. The rates, charges, and other tariff changes authorized herein are just and reasonable, and present rates and charges, insofar as they differ therefrom, are for the future unjust and unreasonable."

notice of how the commission intends to handle SMRT's effect on Pacific's revenues, while finding 13 is a statement that charities will not be exempted from SMRT.

The irrelevance of each of the listed findings to the question before us is obvious. Indeed, this is impliedly conceded in the majority opinion, as it relies on none of them. Instead, the majority turn to other portions of the challenged decision and, apparently, to the record itself, and from these sources derive additional "facts" that assertedly support the decision. Thus it is said that because 60-message-unit customers pay a lower monthly rate than flat-rate subscribers, it is "not necessary" to provide them with "precisely the same form of service." (*Ante,* p. 539.)[5] The majority further recite that "it may be years" before Pacific will have enough equipment to fully implement SMRT and hence it is "not unreasonable" to begin by imposing the system on the relatively small class of 60-message-unit customers (*ante,* pp. 539-540);[6] that "various witnesses before the Commission noted" that imposition of SMRT on that class will give Pacific experience with its effect on customer usage as a whole (*ante,* p. 539);[7] and that 60-message-unit customers retain the ability to avoid any increase in charges either by switching to flat-rate service or "by limiting the duration of their on-peak local telephone calls to five minutes." (*Ibid.*)[8]

The overwhelming objection to invoking any of these "facts," however, is that none is a finding separately stated in the decision as required by section 1705. Even a superficial reading of the commission's 15 findings herein (fn. 4, *ante*) shows that the majority's "facts" are nowhere to be seen among them. It follows that we cannot know if the commission would have made findings on any of the majority's "facts," or intends any of them to serve as a basis for its ultimate finding. The majority's reliance thereon is thus sheer guesswork.

---

[5]Of course the lower monthly rate is already fully justified by the limited number of calls allowed such customers—an average of only two calls per day.

[6]Although the class is small, the length of time its members will be discriminated against is not, as the majority concede. Such discrimination thus appears to violate the statutory mandate that "No public utility shall establish or maintain any unreasonable difference as to rates [or] charges . . . as between classes of service." (§ 453, subd. (c).)

[7]But by the same token, imposition of SMRT will also give incentive to all members of the 60-message-unit class who make calls of long duration to switch to flat-rate service. To the extent this effect occurs, the purpose of the experiment will be frustrated.

[8]The first alternative, as just noted, would defeat the aim of giving Pacific "experience" with this pricing system; and the second suggestion—voluntarily limiting calls to five minutes—is obviously applicable to *all* classes of subscribers, and hence cannot serve to justify imposition of SMRT on 60-message-unit customers alone.

It is also contrary to our prior decisions. For example, in *Southern Pacific Co.* v. *Public Utilities Com.* (1968) *supra,* 68 Cal.2d 243, the commission ordered installation of flashing light signals at a grade crossing. The sole finding of fact stated in its decision was that such signals were adequate to serve "public safety, welfare, convenience and necessity." We did not hesitate to annul the decision because of its failure to provide separately stated findings on each of the facts upon which that ultimate finding was based, even though we acknowledged that "a basis for the commission's order may be gleaned from its decision . . . ." (*Id.,* at p. 244.)

The majority here engage in precisely the kind of "gleaning" process we unanimously rejected in *Southern Pacific.* The "facts" relied on by the majority have apparently been disinterred not only from the body of the decision itself but also from a record consisting of 550 documents and over 7,000 pages of testimony. Given enough time and staff we could probably find at least some evidence in such a voluminous record to sustain virtually any order or decision. But the Legislature has wisely commanded the commission to provide us with explicit, "separately stated" findings to spare this court from having to search the record and speculate as to the factual basis of the decision.

Indeed, in this instance speculation is the only source available to support the conclusion of the majority. In its fourth interim opinion in the checkered history of this case, filed November 2, 1976, the commission expressly found it "unreasonable" to continue with SMRT for 60-message-unit residential service. (Dec. No. 86594, finding 1.)[9] Certainly the ratepayers, as the consuming public, and we, as the reviewing court, are entitled in this fifth interim opinion to a recitation of the facts which assertedly rendered reasonable on July 12, 1977, that which was unreasonable on November 2, 1976, only eight months earlier. No such explanation is offered.

Past experience has taught us the strength and persistence of the tendency of the commission to make inadequate findings in the name of

[9]In the cited decision the commission also terminated SMRT on 30-message-unit service, and explained that "we question whether it is reasonable to apply timing strictures to two out of three classes of residential service. There is no showing that there is any abuse of the system (i.e., overly long calls) by 30MU and 60MU customers; in fact, the service which is most susceptible of abuse by way of too many long calls or heavier than normal traffic is the flat rate residential service, since there is no timing at all.

"We will order an end to residential SMRT, . . ."

expediency. If we allow the present violation of section 1705 to pass unchallenged, it will encourage others and we will surely regret the precedent in cases yet to come.

I would annul the decision.

Bird, C. J., and Newman, J., concurred.

Petitioner's application for a rehearing was denied November 24, 1978. Mosk, J., was of the opinion that the application should be granted.