[S.F. No. 23720. May 16, 1979.]

CALIFORNIA MANUFACTURERS ASSOCIATION et al.,
Petitioners, v.
PUBLIC UTILITIES COMMISSION et al., Respondents;
SOUTHERN CALIFORNIA GAS COMPANY, Real Party in Interest.

[S.F. No. 23721. May 16, 1979.]

CALIFORNIA MANUFACTURERS ASSOCIATION, Petitioner, v.
PUBLIC UTILITIES COMMISSION et al., Respondents;
SAN DIEGO GAS AND ELECTRIC COMPANY,
Real Party in Interest.

252

---

---

## COUNSEL

Gordon E. Davis, William H. Booth, Brobeck, Phleger & Harrison, Philip A. Stohr, Richard R. Gray and Downey, Brand, Seymour & Rohwer for Petitioners.

Whelan & Markman and Martin E. Whelan, Jr., as Amici Curiae on behalf of Petitioners.

Janice E. Kerr, Hector Anninos and Walter H. Kessenick, Jr., for Respondents.

Thomas D. Clarke, E. R. Island and John H. Craig III for Real Party in Interest in No. 23720.

Gordon Pearce, Guenter S. Cohn, C. Edward Gibson, Jeffrey Lee Guttero and Stephen A. Edwards for Real Party in Interest in No. 23721.

---

## OPINION

**CLARK, J.**—In these two proceedings, we review Public Utilities Commission Decision Nos. 87586 and 87587, as modified on petition for rehearing by Decision Nos. 87937 and 87998. The decisions granted Southern California Gas Company and San Diego Gas and Electric

Company rate increases of $41.5 million and $4.7 million, respectively. Petitioners challenge the commission's method of allocating these increases among utility users. The utilities' right to rate increases in the total amounts granted is not challenged.[1]

Southern California Gas Company and San Diego Gas and Electric Company sought authorization to increase rates to offset their higher gas costs. In its application Southern California Gas Company requested that the revenue increases be spread to classes of service by "the system average increase per therm or equivalent" method. Their proposed rates reflected varying charges based on the amount consumed. San Diego Gas and Electric Company proposed spreading the increased revenue requirement on a uniform cents-per-therm basis to all nonlifeline sales. The latter utility also stated it would not oppose any reasonable rate design recommended by the commission staff.

The commission staff proposed six different methods of spreading the increase in the revenue requirement among the users, including the methods proposed by the utilities. The staff's proposals were mailed to interested parties a few days before the scheduled hearings. None of the parties asked for a continuance to present evidence on rate spread.

The commission found that the need for a conservation oriented rate design is critical and the public interest compels restructuring rates. Pointing out that in another case the commission was considering when lifeline rates would be increased, the commission determined not to increase lifeline rates.[2] The commission established a five-tier inverted rate design for residential service for the summer,[3] providing that high priority nonresidential usage would be charged at the highest residential tier and that low priority or interruptible users would be charged one cent

---

[1]The increases granted the utilities are based on increases in their costs in purchasing gas. The costs of Southern California Gas Company and San Diego Gas and Electric Company are interrelated, and the commission consolidated the cases for hearing.

[2]Public Utilities Code section 739 requires the commission to establish a lifeline volume and provides that the commission shall not increase the lifeline rate until the average system rate in cents per therm increased 25 percent or more over the 1 January 1976 level. The 25 percent increases for both utilities occurred prior to the instant proceeding.

[3]The commission stated it would subsequently establish winter rates.

per therm more.[4] The commission stated the rate for interruptible customers was "closer to the cost of alternate fuels" and will serve as a "signal . . . that the hard realities of gas supply and increasing prices are close at hand. Steps by low priority users to convert to alternate fuels must be taken." The commission found the rates fixed reasonable, making them effective immediately.

Denying petitions for rehearing, the commission modified its decisions. The commission stated other cases had shown the declining availability of natural gas. The commission determined that not raising lifeline rates would tend to encourage conservation by residential customers in the blocks above the lifeline block and that if lifeline rates were raised, it would require setting lower rates for nonresidential users thereby impairing conservation goals.[5]

## OFFSET PROCEEDING

■ Pointing out that change in the method for spreading increased costs involves substantial policy decisions, petitioners urge that the change was not proper in an offset proceeding but may be accomplished only in a general rate proceeding.

■ In a general rate setting proceeding, the commission determines for a test period the utility expense, the utility rate base, and the rate of

---

[4]The rates fixed for Southern California Gas Company in part were:

| | G Res. |
|---|---|
| Monthly Customer Charge | $3.10 |
| Commodity Charge—Residential: | |
| First 26 therms, per therm | 12.83¢ |
| Next 54 therms, per therm | 14.00 |
| Next 50 therms, per therm | 15.50 |
| Next 170 therms, per therm | 17.00 |
| Over 300 therms, per therm | 17.95 |
| Commodity Charge—Non-Residential | |
| (Priority 1 and 2 customers): | 17.95¢ |
| Gas Engine and Regular Interruptible | |
| (Priority 3, 4, and 5 customers) | |
| All usage, per therm | 18.95 |

A similar tiered rate structure was established for San Diego Gas and Electric Company although there is a difference in the blocks and in the prices for each block.

[5]In the original proceedings, Commissioner Dedrick did not participate, and Commissioner Symons, filed a dissenting opinion. Commissioner Dedrick voted to deny rehearings, and Commissioner Sturgeon, who had been part of the majority in the original decisions, joined Commissioner Symons in dissenting from the orders denying rehearing.

return to be allowed. Using those figures, the commission determines the revenue requirement, and then fixes the rates for the consumers to produce sufficient income to meet the revenue requirement. (*City of Los Angeles* v. *Public Utilities Commission* (1972) 7 Cal.3d 331, 336 [102 Cal.Rptr. 313, 497 P.2d 785].) Among the matters considered by the commission in a general rate proceeding is the method by which charges are to be allocated among the consumers. (*Id.,* at p. 349.)

■ The rates are fixed in the general proceedings on the basis of historical data. Adjustments may be made in that proceeding for anticipated future extraordinary changes. (*Id.,* at pp. 345-348.) It is obvious revenue, expense, and rate base arrived at on historical data will not remain constant in future years when the rates take effect. The assumption underlying fixing of future rates on historical data is that for future years changes in the revenue, expense, and rate base will vary proportionately so that the utility will receive a fair rate of return.

■ When an item of either expense or revenue tends to vary abnormally in comparison to the utility's other financial criteria, adjustments of rates charged have been permitted in abbreviated proceedings. (*City of Los Angeles* v. *Public Utilities Com.* (1975) 15 Cal.3d 680, 692 [125 Cal.Rptr. 779, 542 P.2d 1371].) Such proceedings—termed offset proceedings by the parties—have been used in the past to make rate adjustments necessitated by increases in fuel costs disproportionate to the variation in other costs. (*Id.,* at p. 695.)

Although language exists in *Southern Cal. Edison Co.* v. *Public Utilities Com.* (1978) 20 Cal.3d 813, 828 [144 Cal.Rptr. 905, 576 P.2d 945], stating "true" ratemaking procedures involve many variables and broad policy determinations, whereas fuel cost adjustment proceedings are "narrowly restricted" and "semi-automatic," such language should not limit the commission to exercising its discretion and to determining policy only in general proceedings.

The proceedings in that case reflect that major policy decisions may be made in abbreviated proceedings. There, the commission had fixed the rates for the utility in 1971 in a general rate proceeding. Because of large increases in the price of fuel, the commission in 1972 established a fuel cost adjustment clause providing for periodic changes in the rates and granted an immediate increase. Several years later, in the decision reviewed, the commission as a result of an investigation concluded that the traditional basis for calculating fuel requirements (average weather

conditions) should be abandoned in favor of a recorded data basis with adjustments in rates and credits for past rates. It is obvious that major policy determinations were made affecting rates in both the 1972 determination to authorize fuel cost adjustments, and the decision under review modifying the method for calculating the adjustment and ordering credits.

By affirming the commission's order changing the method of calculating the fuel cost adjustment and directing credits in *Southern Cal. Edison Co.* v. *Public Utilities Com., supra,* 20 Cal.3d 813, 831, this court's decision reflects that the commission may make policy decisions in offset proceedings and that it need not wait for general rate increase proceedings.

Moreover, to hold that the commission's power in abbreviated or offset proceedings ·is limited to mechanical or semi-automatic adjustments would unduly hamper the commission's work. The commission would then be required to hold general proceedings when deciding to question any segment of the prior general proceeding. Indeed, as illustrated by the applications in this case, even the power to grant fuel cost adjustment would become largely illusory. It was apparent that in order to grant the utilities fuel cost adjustments, the commission had to decide whether to continue to exempt from rate increases the lifeline volume when the exemption was no longer required by statute. (See *ante,* fn. 2.) Little purpose is served by requiring the commission to hold a general rate proceeding, recalculating all expenses, revenues, rate base, and rate of return, when the only substantial issues are extraordinary changes in fuel costs and method of apportionment of the increase in the revenue requirement to customers.

### FINDINGS AND EVIDENCE

Public Utilities Code section 1705 provides that "the commission shall make and file its order, containing its decision. The decision shall contain, separately stated, findings of fact and conclusions of law by the commission on all issues material to the order or decision . . . ."

█ Findings are essential to "afford a rational basis for judicial review and assist the reviewing court to ascertain the principles relied upon by the commission and to determine whether it acted arbitrarily, as well as assist parties to know why the case was lost and to prepare for

rehearing or review, assist others planning activities involving similar questions, and serve to help the commission avoid careless or arbitrary action." (*Greyhound Lines, Inc.,* v. *Public Utilities Com.,* 65 Cal.2d 811, 813 [56 Cal.Rptr. 484, 423 P.2d 556]; *Toward Utility Rate Normalization* v. *Public Utilities Com.* (1978) 22 Cal.3d 529, 537 et seq. [149 Cal.Rptr. 692, 585 P.2d 491]; *City of Los Angeles* v. *Public Utilities Commission, supra,* 7 Cal.3d 331, 337; *Pacific Tel. & Tel. Co.* v. *Public Util. Com.* (1965) 62 Cal.2d 634, 648 [44 Cal.Rptr. 1, 401 P.2d 353]; *California Motor Transport Co.* v. *Public Utilities Com.* (1963) 59 Cal.2d 270, 274-275 [28 Cal.Rptr. 868, 379 P.2d 324].)

■ The findings on the material issues are insufficient to justify the rate spread adopted. While the commission's asserted justification for changing its method of spreading rate increase is conservation of natural gas resources, neither finding nor evidence exists showing the method adopted will result in conserving more natural gas than would other proposed methods.

For all that appears in the record before us, the pro rata approaches suggested by the utilities or one of the plans urged by the staff might accomplish less gas usage than results from the rates adopted by the commission. As we have seen, a utility's revenue requirement is determined by its costs, rate base, and rate of return. In allocating the revenue requirement among several groups of gas users, it is obvious that if an increase is made in the revenue requirement from one, a decrease necessarily follows in the revenue requirement allocable to others.

The fixed marketplace tells us that the higher the price, the higher the incentive to reduce consumption and therefore to conserve; conversely, that relatively lower prices generally provide a lower incentive to conserve. When alternative plans for spreading rates are compared to determine their conservation effects, it is apparent that any plan creating higher charges for one group must also allow lower charges for some other group, and thus each plan will provide greater incentive to conserve for some users but lesser incentive for others. Without some expert testimony or empirical data reflecting elasticity of need and demand for the various groups, it cannot be determined which plan will result in least usage.

For example, the rate spread adopted by the commission when compared to the pro rata approaches suggested by the utilities results in

higher rates for nonresidential users but lower rates for residential users. The commission's plan provides a greater incentive to conserve for nonresidential users than the other plans but lesser incentives for residential users. However, in absence of any evidence as to elasticity of demand, it is impossible to determine which plan is likely to result in least usage. Under the commission's plan when compared to others, reduced consumption by nonresidential consumers may be more than offset by the consumption of residential consumers.

The findings and evidence as to conservation are not sufficient to justify the commission's rate spread order because nothing exists to show that its plan is more likely to result in conservation than another plan. While the commission made findings relating to the benefits of lifeline usage and conversion to alternate fuels, the rate spread order cannot be justified by those matters alone.[6]

The decisions must be annulled for lack of sufficient findings.

### DISCRIMINATION

Public Utilities Code section 453 provides that "no public utility shall, as to rates, charges, service facilities, or in any other respect, make or grant any preference or advantage to any corporation or person or subject any corporation or person to any prejudice or disadvantage."

Petitioners recognize the commission's power to make economic classifications, characterizing it as "a discretionary exercise of its quasi-legislative function." ■ This court stated in *Wood* v. *Public Utilities Commission* (1971) 4 Cal.3d 288, 294-295 [93 Cal.Rptr. 455, 481 P.2d 823]: "The commission must fix rates that will provide a reasonable return on the utility's investment, and in doing so it has wide discretion to make rate classifications that reflect a broad and varied range of economic considerations. [Citations.]" Within its "wide discretion," it follows that the commission may properly consider prospective shortages of natural gas and the need to conserve that commodity.

Petitioners do not deny the need to conserve energy may be considered by the commission in establishing rate spread. Rather petitioners urge

---

[6]Even assuming the special findings as to lifeline usage and interruptible users would support the commission's order as to those "brackets," the commission's order as to other brackets is not justified.

that the commission abuses its discretion whenever it sets rates for one class of users below cost of service and, to provide sufficient overall revenue for the utility, sets rates for others above cost of service. Because the utility's revenue requirement is based on cost (expenses plus capital return) and because customer rates are designed to provide the revenue requirement, it is apparent that consideration by the commission of any factor other than cost will result in some customers paying less while others necessarily pay more than cost. Having discretion to consider factors other than cost, the commission must necessarily create some disparity among users. Whether such disparity reaches the plateau of arbitrary or discriminatory action can only be determined upon a more adequate record and sufficient findings following remand.

## RETROACTIVITY

The utilities urge that because all agree that the utilities were entitled to rate increases, any relief granted in the cases should be prospective only. The utilities have been collecting the charges authorized. Apparently the utilities fear that, should the commission's order be annulled, the utilities will be required to refund the rate increases and be denied increased revenues to which they were undisputedly entitled.

The utilities' briefs were filed prior to the recent decision in *Southern Cal. Edison Co.* v. *Public Utilities Com., supra,* 20 Cal.3d 813. ■ In that case the court held that rate changes based on increased fuel costs do not involve ratemaking and that therefore the rule against retroactive ratemaking was not applicable to refunds ordered on the basis of recalculation of utility fuel costs. The same rule applies to surcharges based on recalculations of costs and their allocation. Accordingly, the commission is directed to hold further hearings on the appropriate method to spread the utilities' rate increase and depending on its determinations, the commission shall order refunds and surcharges for the period involved.

The decisions are annulled for lack of sufficient findings and evidence. On remand, the commission shall determine an appropriate method to spread the rate increase to which the utilities are entitled. Having ascertained an appropriate rate spread, the commission shall order

refunds and surcharges, if appropriate, all in compliance with Public Utilities Code section 1705.

Richardson, J., Manuel, J., and Caldecott, J.,* concurred.

**MOSK, J.**—I concur.

I agree that the findings are inadequate under Public Utilities Code section 1705, for the reasons set forth in my dissenting opinion in *Toward Utility Rate Normalization* v. *Public Utilities Com.* (1978) 22 Cal.3d 529, 545 [149 Cal.Rptr. 692, 585 P.2d 491] (*TURN*).

Perhaps some ironic comfort can be found in the fact that the commission has been equally consistent in making inadequate findings for small consumers in the *TURN* case and for large consumers in the instant case. I am unable to obtain such comfort, however, from majority decisions of this court which are oblivious to the commission's violation of law when small consumers are involved but perceive the problem clearly when large consumers are affected.

Since I believe in protection of the statutory rights of all ratepayers, large and small, I join in the majority opinion.

Bird, C. J., and Newman, J., concurred.

---

*Assigned by the Chairperson of the Judicial Council.