[S.F. No. 24687. Aug. 15, 1985.]

CITY AND COUNTY OF SAN FRANCISCO et al., Petitioners, v.
PUBLIC UTILITIES COMMISSION et al., Respondents;
PACIFIC BELL, Real Party in Interest.

COUNSEL

George Agnost, City Attorney, Leonard L. Snaider, Deputy City Attorney, John Witt, City Attorney, and William S. Shaffran, Deputy City Attorney, for Petitioners.

Janice E. Kerr, Hector Anninos and Walter A. Kessenick for Respondents.

James S. Hamasaki, Duane G. Henry, Pillsbury, Madison & Sutro, Robert M. Westberg and Kevin M. Fong for Real Party in Interest.

OPINION

MOSK, J.—The present petition for a writ to review Decision No. 83-10-035 of respondent California Public Utilities Commission (hereinafter

the commission) in essence raises a single issue: Did the commission regularly pursue its authority in estimating that real party in interest Pacific Bell, then known as Pacific Telephone and Telegraph Company (hereinafter Pacific), would incur $402.1 million in total company service connection costs—commonly known as installation costs—and consequently authorizing Pacific to raise its intrastate rates by $264 million to offset the effect of such costs on its intrastate operations? The commission and Pacific answer the question in the affirmative, petitioners City and County of San Francisco and City of San Diego (hereinafter the cities) in the negative. We conclude that the commission and Pacific are correct and that the decision must accordingly be affirmed.

In August 1980 Pacific filed an application for a general rate increase. The commission initially authorized a rate increase of $610 million in August 1981. The cities applied for a rehearing, arguing that the commission had not been consistent in its treatment of the anticipated effects of the increased use of PhoneCenter Stores by Pacific's customers.[1] Specifically, the cities contended that while the commission recognized Pacific would experience a reduction of $63.7 million in installation revenues in a 1981 test year as a result of increased use of PhoneCenter Stores, it failed to consider whether Pacific would experience a corresponding reduction in installation costs. The cities alleged that Pacific would indeed experience such a corresponding reduction and that it would be substantial—$70 million. Because installation costs were at that time capitalized, or included in the rate base, a $70 million reduction in such costs would require a reduction of $12.8 million in the annual rate increase initially authorized by the commission. The commission rejected the cities' argument and denied their application in October 1981.

The cities then petitioned this court for a writ to review this issue. In March 1982 we granted the petition. Before oral argument, however, the parties settled the dispute: Pacific requested an order reducing its rate base by $70 million and its rate increase by $12.8 million; the commission issued such an order; and the cities and Pacific stipulated that the dispute had been mooted. We accordingly dismissed the petition for writ of review.

In the meantime the Federal Communications Commission (hereinafter the FCC) adopted a decision in November 1980 amending the Uniform System of Accounts for Class A and Class B Telephone Companies to pro-

---

[1]PhoneCenter Stores are retail telephone equipment outlets. Instead of arranging for—and paying—Pacific to deliver and install a telephone, a customer may select one at a Phone-Center Store, take it home, and install it himself.

vide for the expensing of future installation costs and the amortization of embedded installation costs over a period of 10 years. Previously such costs had been treated as capital expenditures.[2] In response to the FCC action, the commission initiated a proceeding in December 1980 on the revision of accounting and related ratemaking effects by its Order Instituting Investigation 84 (hereinafter OII 84). In March 1981 the FCC released the accounting revision decision, to become effective October 1, 1981.

Along with other California telephone utilities, Pacific then initiated the present proceeding by filing an application for increased revenues to offset the increased costs associated with the accounting revision. During the period in which installation costs were capitalized, they were not directly considered in the cost of service in determining the utility's revenue requirement, that is, the amount of revenue needed to cover its operating expenses and to provide it with a reasonable return on its investment. With the accounting revision, there was an immediate and automatic increase in operating expenses for accounting purposes and accordingly an immediate and automatic increase in revenue requirement to offset such an increase: installation costs would now immediately be recognized in full as a cost of service, instead of, as previously, being recognized over time as capital costs. Pacific's application was combined with OII 84 for hearing and decision.

In November 1981 the commission, in a decision in OII 84, adopted the FCC proposal and ordered that all California telephone utilities expense their future installation costs and amortize their embedded installation costs over a period of 10 years.[3] In the same decision the commission, estimating that Pacific would incur $402.1 million in total company installation costs in a 1981 test year, found that Pacific needed an additional $264 million in revenue to offset the effect of such costs on its intrastate operations, and accordingly authorized it to increase its intrastate rates by that amount. The cities applied for a rehearing, alleging that the appropriate level of rate increase for Pacific could be affected by the disposition of their then-pending

---

[2]One of the objectives of the FCC in requiring the expensing of installation costs was to shift the burden of such costs from the general body of ratepayers to the customers who actually cause them. (FCC Final Rule, 47 C.F.R. pt. 31, 46 Fed.Reg. 19481 (Mar. 31, 1981).)

[3]Although in the near term the accounting revision would result in an increase in revenue requirements and consequently an increase in telephone rates, the commission adopted the FCC proposal as being in the public interest in the long term: the accounting revision would apparently serve to shift a larger share of installation costs from the general body of ratepayers to those who actually cause such costs—that is, the relatively small percentage of generally more affluent customers who move often and have more than one extension telephone. (See fn. 2, *ante.*)

petition for writ of review in the general rate proceeding. In January 1982 the commission denied the cities' application, but modified its decision to make Pacific's rate increase subject to refund and to reserve jurisdiction to consider what effect if any the disposition of the general rate proceeding issue would have on the present proceeding.

After the 1982 settlement in the general rate proceeding, the commission turned to consider whether it should make any adjustment in the $264 million allowed to Pacific in the present proceeding. In October 1983 the commission issued Decision No. 83-10-035, which is the subject of the present petition. In that decision the commission concluded that the $264 million rate increase was supported by the record in this proceeding and that it was therefore not reasonable to reduce it automatically as a result of the settlement in the general rate proceeding: the 1981 test-year installation cost estimate presupposed in the general rate proceeding and the 1981 test-year installation cost estimate developed in the present proceeding were different and were based on materially different evidentiary records. Accordingly, the commission declined to reduce the additional rate increase allowed to Pacific. The cities now petition for a writ to review that decision.

The scope of our review of a commission decision is limited: "The review shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order or decision under review violates any right of the petitioner under the Constitution of the United States or of this State." (Pub. Util. Code, § 1757; accord *Toward Utility Rate Normalization* v. *Public Utilities Com.* (1978) 22 Cal.3d 529, 537 [149 Cal.Rptr. 692, 585 P.2d 491].) Moreover, the commission's findings are ordinarily conclusive and not subject to review: "The findings and conclusions of the commission on questions of fact shall be final and shall not be subject to review except as provided in this article. Such questions of fact shall include ultimate facts and the findings and conclusions of the commission on reasonableness and discrimination." (Pub. Util. Code, § 1757.) ■ Further, if they are supported by any evidence, such findings may not be set aside. (See *Yucaipa Water Co. No. 1* v. *Public Utilities Com.* (1960) 54 Cal.2d 823, 828 [9 Cal.Rptr. 239, 357 P.2d 295].) Accordingly, the commission's findings based on conflicting evidence or on undisputed evidence from which conflicting inferences may reasonably be drawn are final and not subject to review. (*Southern Pac. Co.* v. *Public Utilities Com.* (1953) 41 Cal.2d 354, 362 [260 P.2d 70]; see *City of Los Angeles* v. *Public Utilities Com.* (1972) 7 Cal.3d 331, 351 [102 Cal.Rptr. 313, 497 P.2d 785].) In short, "[t]here is a strong presumption favoring the validity of a Commission decision." (*Toward Utility Rate Normalization* v. *Public Utilities Com., supra,* at p. 537; accord *Greyhound*

*Lines, Inc.* v. *Public Utilities Com.* (1968) 68 Cal.2d 406, 410 [67 Cal.Rptr. 97, 438 P.2d 801].)

The cities, as we shall explain, have failed to carry their burden. The present proceeding is what is commonly referred to as an "offset proceeding," as all parties recognize.  ▇  "In a general rate setting proceeding, the commission determines for a test period the utility expense, the utility rate base, and the rate of return to be allowed. Using those figures, the commission determines the revenue requirement, and then fixes the rates for the consumers to produce sufficient income to meet the revenue requirement. . . . [¶] The rates are fixed in the general proceedings on the basis of historical data. Adjustments may be made in that proceeding for anticipated future extraordinary changes. [Citation.] It is obvious revenue, expense, and rate base arrived at on historical data will not remain constant in future years when the rates take effect. The assumption underlying fixing of future rates on historical data is that for future years changes in the revenue, expense, and rate base will vary proportionately so that the utility will receive a fair rate of return." (*California Manufacturers Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 251, 256-257 [155 Cal.Rptr. 664, 595 P.2d 98].)

▇  In an offset proceeding, by contrast, both the purpose and the scope of the commission's inquiry is limited. In such a proceeding, the commission, without waiting until the utility's next general rate proceeding,[4] determines whether there has occurred a significant and not reasonably foreseeable change in an item of expense or revenue that, unless taken account of, would seriously affect the utility or its ratepayers. (See *California Manufacturers Assn.* v. *Public Utilities Com., supra,* 24 Cal.3d at p. 257; see also *Southern Cal. Edison Co.* v. *Public Utilities Com.* (1978) 20 Cal.3d 813, 828-830 [144 Cal.Rptr. 905, 576 P.2d 945] [annual adjustment clause].) As a consequence, the commission is not required to conduct an inquiry equivalent to that in a general rate proceeding, "recalculating all expenses, revenues, rate base, and rate of return . . . ." (*California Manufacturers Assn.* v. *Public Utilities Com., supra,* at p. 258.) Rather the commission need only determine the relevant extraordinary change and then take account of it by adjusting the utility's rates to offset the effect of such change, with all other items of expense and revenue held constant as estimated in the utility's most recent general rate proceeding. (See *id.* at p. 258;

---

[4]Previously a general rate proceeding might be initiated only once every two years (Cal.P.U.C., Regulatory Lag Plan for Major Utility General Rate Cases, Res. M-4706 (June 5, 1979)); now it may be initiated only once every three years (Cal.P.U.C., Revised Scheduling for Test Year Rate Increase Filings Under the Rate Case Plan, Res. ALJ-149 (June 6, 1984)).

*City of Los Angeles* v. *Public Utilities Com.* (1975) 15 Cal.3d 680, 691-692 [125 Cal.Rptr. 779, 542 P.2d 1371].)

The cities in essence make a single, factual contention: the commission's estimate of Pacific's installation costs and the rate increase based on it are unreasonably high. The claim is without merit. As will appear, the commission's estimate is firmly based on evidence in the record; indeed, neither the cities nor anyone else has presented any evidence that would support a lower estimate and hence a smaller rate increase.

■ The cities first argue that the commission erred in failing to automatically reduce its estimate of Pacific's installation costs by $70 million. The commission, they assert, initially failed to recognize the effect of increased use of PhoneCenter Stores on Pacific's installation costs in the general rate proceeding; it subsequently corrected this error by adopting a $70 million reduction in Pacific's rate base; it has refused, however, to correct a similar error in this proceeding.

The commission and Pacific respond that the commission neither made nor corrected any "error" in the general rate proceeding. They argue that the commission made the reduction at the request of Pacific, which was acting to settle the dispute between the cities and itself.

In any event, the cities cannot show, as they must, that any error in the general rate proceeding automatically affected this proceeding and consequently required the same $70 million reduction. The reason is simple: the two proceedings were separate and distinct and were based on materially different evidentiary records containing materially different data. In the general rate proceeding, the commission staff developed and the commission adopted an estimate of $865.8 million for Pacific's total station equipment costs (of which installation costs are a part)—an estimate that contained no separate figures for installation costs. In this proceeding, on the other hand, the commission had available more recent data, including five months of recorded 1981 results. Using such data the commission staff developed a total station equipment cost estimate of $767 million—which is $98 million lower than its general rate proceeding estimate—and a separate installation cost estimate of $402.1 million, which expressly takes into account the effect of increased use of PhoneCenter Stores.[5]

---

[5] In denying rehearing of Decision No. 83-10-035, the commission explained: "As we concluded in D.83-10-035, if we accepted the Cities' suggestion that Pacific's estimated station connection expense be reduced by the intra-state portion of $70 million, the result would have been incompatible with the later data on that item, including five months of actual expenses for 1981 . . . ."

Further, the cities do not show that the installation cost estimate, which they allege is unreasonably high, is unreasonable in itself. First, the estimate is supported by the testimony of the staff witness who developed it. Although they attack this testimony here as they did below, the cities do not succeed in discrediting it. Second, the estimate is also supported by the testimony of Pacific's witness, which the cities did not even attempt to controvert. Finally, the cities have offered no evidence that would support a lower estimate and a smaller rate increase.[6]

■ The cities next contend that the commission made inconsistent findings on installation costs and revenues and that under *Cal. Portland Cement Co.* v. *Public Util. Com.* (1957) 49 Cal.2d 171 [315 P.2d 709], its decision must be annulled.

The simple response is that no such inconsistency exists: the commission did not make a finding on installation revenues in this proceeding and was not required to do so. The purpose of the present offset proceeding is to keep Pacific whole in the face of the accounting revision. Unlike, for example, the increased use of PhoneCenter Stores considered in the general rate proceeding, which could affect both revenues and costs, *the accounting revision considered here could by definition affect only costs:* it merely transformed installation costs into an expense item. Thus, installation costs were a material issue, but installation revenues were not.

■ The cities finally assert in effect that the commission may not use estimates of installation costs and revenues based on different data in different proceedings. The argument in essence runs as follows: In the general rate proceeding the commission used certain data to estimate installation costs and revenues and based the rate increase allowed to Pacific in part on such estimates; in the present offset proceeding, by contrast, the commission used more recent data, which yielded a higher estimate of installation costs and would correspondingly yield a higher estimate of installation revenues. To prevent Pacific from receiving a windfall, the commission must assertedly do one of two things: use the lower estimate of installation costs developed in the general rate proceeding in the present offset proceeding and thereby reduce the rate increase allowed to Pacific to offset the effect of the

[6]If Pacific's actual results for the first five months of 1981—part of the more recent data available to the commission in this proceeding—were annualized on a straight line basis, they would yield a figure of over $398 million for total company installation costs—very close to the commission's estimate of $402.1 million. Moreover, in July 1982 Pacific made an offer of proof to show that its actual recorded installation costs for 1981 were $404.2— just about one-half of 1 percent higher than the estimate. The commission rejected Pacific's offer of proof, preferring to stand on its original estimate.

accounting revision, or use the higher estimate of installation revenues that can be developed from the data in the present offset proceeding in the general rate proceeding and thereby reduce the general rate increase allowed to Pacific.

To address this argument properly we must start with certain observations. ■ First, the commission may prescribe rates only prospectively; if its determination is reasonable when made, it will stand even if subsequent events prove it to be otherwise. (See *City of Los Angeles* v. *Public Utilities Com.*, *supra,* 7 Cal.3d 331, 338; *Pacific Tel. & Tel. Co.* v. *Public Util. Com.* (1965) 62 Cal.2d 634, 649-656 [44 Cal.Rptr. 1, 401 P.2d 353].) ■ Second, in any test-year proceeding the commission must choose a test period that "present[s] as nearly as possible the operating conditions of the utility which are known or expected to obtain during the future months or years for which the commission proposes to fix rates" and that consequently yields estimates of results of operations that "will be as nearly representative of future conditions as possible." (*Pacific Tel. & Tel. Co.* v. *Public Util. Com., supra,* at p. 645.) Thus, the commission properly makes a choice between two or more test-year estimates on the ground that one is based on more recent data and is therefore likely to be a more accurate representation of the utility's actual experience during the relevant period. (See *SoCal Edison Co.* (1980) 5 Cal.P.U.C.2d 39, 69-71; *SDG&E Co.* (1980) 5 Cal.P.U.C.2d 208, 232-233.)

■ The commission may therefore use different estimates based on different data in different proceedings. The present offset proceeding is separate and distinct from the general rate proceeding; it was initiated later and had available more recent data. The commission properly used more recent data in the later offset proceeding in order to develop an estimate of installation costs "as nearly representative of future conditions as possible"; and it has properly refused to make any revision in its estimate of installation revenues in the earlier general rate proceeding—an estimate that neither Pacific nor the cities attacked as unreasonable there. Thus the cities' argument fails.

In other words, neither of the alternatives the cities propose is appropriate. First, in the present offset proceeding the commission should not use the estimate of installation costs developed in the general rate proceeding. Here it has a reasonable estimate developed from more recent data to support its determination of the rate increase necessary to offset the effect of

the accounting revision on Pacific.[7] Second, the commission should not use in the general rate proceeding the higher estimate of installation revenues that can allegedly be developed from the data in the present offset proceeding. Such an action would in effect reopen the general rate proceeding, which is now final and no longer subject to review; it would also threaten impermissible, retroactive ratemaking.

The decision is affirmed.

Broussard, J., Reynoso, J., Grodin, J., Lucas, J., and Sabraw, J.,* concurred.

**BIRD, C. J.**—I respectfully dissent. The Public Utilities Commission (PUC) erred by granting Pacific Telephone and Telegraph Company (Pacific) a rate increase that took into account the most recent data on Pacific's costs from "station connection" or installation services but which failed to take into account the most recent data on Pacific's revenues from those services.

This is not to say that the PUC acted improperly in granting Pacific a rate increase to offset the effect of the change in accounting of its installation costs. This change was strictly a matter of how an item of cost as estimated in the general rate proceeding was to be listed on Pacific's books. It did not in and of itself require a revision in the estimated amount.

As a matter of uniform accounting, two major conforming changes were necessary: a reduction in Pacific's rate base as a direct result of the reduction in the capital expense account, which is a component of the rate base, and an increase in Pacific's revenue requirement to reflect the combined effect of the increase in current expenses and the decrease in rate base.[1] In common sense terms, these changes accorded with the purpose of expensing rather than capitalizing the installation costs. That purpose was to permit Pacific to charge its customers in the year of expenditure for costs which previously had been capitalized and recovered over several years.

---

[7]We observe generally that the commission should not be barred from adopting in an offset proceeding an estimate that is based on more recent data and is accordingly different from that adopted previously in a general rate proceeding. To do so would be antithetical to the very purpose of offset proceedings—viz., to recognize the effect of a change in an item of expense or revenue that is both significant and *not reasonably foreseeable at the time of the last general rate proceeding*.

*Assigned by the Chairperson of the Judicial Council.

[1]The reduction in the capital expense account also caused offsetting reductions in the accounts for depreciation, income taxes, and property taxes.

However, the PUC also revised its estimate of actual installation costs at the same time that it was shifting them from a capital to a current expense account. No corresponding revision in the estimate of Pacific's installation revenues was made. The practical result was a larger rate increase than would have been granted if the latest data on both costs and revenues from installations had been used. The rate increase was also larger than it would have been if only the accounting change had been made. In that event, the installation cost estimate adopted in the general rate proceeding would have been retained, subject only to the $70 million reduction ordered by the PUC pursuant to the settlement of the cities' earlier suit. By rejecting both of these alternatives and choosing instead to retain the old installation revenue estimate while adopting a revised cost estimate—no matter how accurate— the PUC failed regularly to pursue its authority. (Pub. Util. Code, § 1757; see *City of Los Angeles* v. *Public Utilities Com.* (1975) 15 Cal.3d 680, 691-692 [125 Cal.Rptr. 779, 542 P.2d 1371].)

In deciding otherwise, the majority adopt a general rule which is ill-suited to the circumstances that justified a rate adjustment in this case and which does not even correspond to the action taken by the PUC. The majority hold that in an offset proceeding "the commission need only determine the relevant extraordinary change and then take account of it by adjusting the utility's rates to offset the effect of such change, with all other items of expense and revenue held constant as estimated in the utility's most recent general rate proceeding." (Maj. opn., *ante,* at p. 531.)

The majority's formulation is inapplicable to this case because it assumes an isolated increase in the actual cost of an item, unaccompanied by a corresponding increase in revenue from that item.[2] In this case, by contrast, the adjustment was made necessary not by a change in actual costs but by a change in accounting practices. The PUC could not, and did not, make the necessary rate adjustment by changing a single item of expense while holding "all other items of expense and revenue . . . constant as estimated in the utility's most recent general rate proceeding." (Maj. opn., *ante,* at p. 531.) Rather, when the cost of installation was shifted from a capital to a current or operating expense account, changes in both accounts were necessary.

---

[2]An example would be a sudden rise in the cost of the fuel required by a power company to generate electricity. Such a change would not be accompanied by an increase in the utility's revenues from sale of electricity, since the rates at which it could sell the electricity were fixed. (See *California Manufacturers Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 251, 257 [155 Cal.Rptr. 664, 595 P.2d 98]; *City of Los Angeles* v. *Public Utilities Com., supra,* 15 Cal.3d at p. 695 & fn. 32.)

More important, higher installation costs are unavoidably accompanied by higher installation revenues, since customers are billed separately for installation. Thus, actual changes in installation costs do not qualify as the sort of changes which, because they tend "to vary abnormally in comparison to the utility's other financial criteria" (*California Manufacturers Assn. v. Public Utilities Com.*, supra, 24 Cal.3d at p. 257), may be taken into account in revising rates without first revising revenue figures as well (*ibid.*). If the cost figure is revised, the revenue figure must also be revised or the resulting rate change will not "accurate[ly] represent[] the utility's actual experience during the relevant period" (maj. opn., *ante,* at p. 534).[3]

The cases on which the majority rely are readily distinguished. Rate adjustments were required in those cases as the result of extraordinary changes in the *actual* cost of a single item, such as fuel (see, e.g., *California Manufacturers Assn. v. Public Utilities Com.*, supra, 24 Cal.3d at p. 257) or in the *actual* amount accumulating in a single, unchanged accounting category, such as deferred tax reserves (see *City of Los Angeles v. Public Utilities Com.*, supra, 15 Cal.3d at p. 691). Such changes are extraordinary in that they are not accompanied by simultaneous, offsetting changes on the other side of the utility's balance sheet. It is reasonable to adjust a utility's rates to cover exceptional costs for which there is no corresponding increase in revenues, and to do so without recalculating the estimate of revenues made in the most recent general rate setting proceeding.

The "extraordinary change" in this case was a change in the method of *accounting* for one of the utility's costs. Had there been no change in accounting and only a change in the data on actual installation costs, there would have been no independent legal basis for an offset proceeding to modify the estimate. The reason is simple: an increase in these costs is accompanied by a roughly equivalent increase in revenues.[4] Hence, in the absence of the accounting change, the PUC would have rejected any application for an interim rate increase. The installation cost estimate employed

---

[3] The majority properly reject the cities' contention that a new estimate of installation revenues should be applied retroactively in the general rate proceeding. (Maj. opn., *ante,* at p. 534; see *City of Los Angeles v. Public Utilities Commission* (1972) 7 Cal.3d 331, 338 [102 Cal.Rptr. 313, 497 P.2d 785]; *Pacific Tel. & Tel. Co. v. Public Util. Com.* (1965) 62 Cal.2d 634, 649-656 [44 Cal.Rptr. 1, 401 P.2d 353].) However, the rule against retroactive general ratemaking does not preclude a revision of estimates, restricted to two integrally related items of revenue and cost, in the present offset proceeding. Such a revision would not constitute the impermissible reopening of the general rate proceeding against which the majority warn.

[4] The record indicates that the amount Pacific charged for installation varied over the course of 1981 from approximately 50 percent to approximately 110 percent of the full cost of installation.

in the general rate setting proceeding, as modified in the settlement of the cities' earlier suit, would have been left unaltered.

A change in the accounting of installation costs did occur, and a rate adjustment was necessary as a result. It would be senseless to require the PUC, in calculating the resulting rate increase, to ignore reliable data based on actual operating experience, which indicates a need for revision of the estimate of those costs. If more recent, reliable data is available, the fairest and most accurate measure of the impact of an accounting change on a utility's revenue requirement can be obtained by revising the estimates of both costs *and* related revenues from the item for which the accounting change is being made, leaving all other items of cost and revenue constant.[5] This procedure would comport with the recognized purpose of an offset proceeding and would not constitute impermissible, retroactive ratemaking.

I would remand the matter to the PUC with instructions to revise its estimate of Pacific's installation revenues, based on the same data that was used to revise the estimate of installation costs, and to adjust the rate increase granted to Pacific accordingly.

---

[5]An additional factor supports use of revised cost and revenue estimates rather than the original estimates. Pursuant to the parties' earlier settlement, the PUC ordered a $70 million reduction in the rate base adopted in the general rate proceeding. This adjustment was made to reflect the increased use of PhoneCenter stores by residential customers and the resulting decrease in Pacific's installation costs. However, the PUC's order does not state that the reduction is attributable specifically to the "station connection" or installation account, as opposed to other accounts which comprise Pacific's total station equipment costs. Moreover, the cost estimates adopted in the general rate proceeding did not include a breakdown for installation costs. Thus, it would be difficult to determine the appropriate cost figure.