Filed 6/18/19; pub. order 6/28/19 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PONDEROSA TELEPHONE CO., et al., <br><br> Petitioners, <br><br> v. <br><br> CALIFORNIA PUBLIC UTILITIES COMMISSION, <br><br> Respondent. | F076845 <br><br> (CPUC Decision Nos. 16-12-035 & 17-12-029) <br><br> **OPINION** |

ORIGINAL PROCEEDINGS; petition for writ of review.

Cooper, White & Cooper, Mark P. Schreiber, Patrick M. Rosvall, Sarah J. Banola, and Priya D. Brandes, for Petitioners.

Arocles Aguilar, Helen W. Yee, and Eleanor M.W. Youngsmith for Respondent.

-ooOoo-

In this original proceeding, three rural telephone companies, The Ponderosa Telephone Co., Sierra Telephone Company, Inc,. and Volcano Telephone Company (together petitioners), challenge the decision of the California Public Utilities Commission (PUC) establishing petitioners' "cost of capital," which is a financial yardstick used by the PUC as a component in ratemaking.[1] Conceptually, a utility

---

[1] In decision No. 16-12-035 entitled "Decision Determining the Cost of Capital for Ratemaking Purposes for California's Independent Small Telephone Companies," the PUC determined petitioners' cost of capital (PUC decision). In decision No. 17-12-029, the PUC denied a request for rehearing. Petitioners challenge both decisions.

company's cost of capital, also referred to as a rate of return, reflects that company's cost of generating or obtaining capital for investment in assets (e.g., facilities, equipment or infrastructure) that provide utility services to customers.[2] Petitioners contend the PUC failed to adequately consider certain risks that exist for investing in small, rural telephone companies, and therefore the cost of capital was set at an unreasonably low level, resulting in a confiscatory rate of return. Based on this line of argument, petitioners claim the PUC decision should be annulled as allegedly (i) contrary to constitutional principles that require a reasonable rate of return, and (ii) lacking in substantial evidence or otherwise arbitrary and capricious. The PUC responds that its determination of petitioners' cost of capital was a reasonable decision based on a fair consideration of all the evidence and argument, noting further that it was not required to adopt the methodology urged by petitioners. Also, the PUC points out that some of the purported risks are mitigated through revenue subsidies received by petitioners as small rural telephone companies.

On balance, we conclude petitioners have failed to meet their burden of demonstrating that the PUC's cost of capital determination was arbitrary, capricious, lacking in any evidentiary support, or that it otherwise fell short of constitutional standards regarding a reasonable rate of return. Accordingly, the PUC's decision Nos. 16-12-035 and 17-12-029 are hereby affirmed.

## FACTS AND PROCEDURAL HISTORY

The Parties

Petitioners are small, rural, independent, privately-owned telephone companies, also known as Incumbent Local Exchange Carriers (sometimes referred to in the record as LEC's or ILEC's). These companies offer basic local telephone service to customers

---

[2] See, *The Ponderosa Telephone Co. v. Public Utilities Com.* (2011) 197 Cal.App.4th 48, 51-52 (*Ponderosa*).

in rural and remote areas of California, are considered carriers of last resort within their service areas, and are each regulated by the PUC under a traditional "rate of return" regulatory structure.  Additionally, pursuant to Public Utilities Code[3] section 275.6, petitioners receive supplemental ratepayer funding through the California High-Cost Fund-A Administrative Committee Fund Program (CHCF-A program).  (§ 275.6, subds. (a) & (d).)  Because the cost of providing service in rural and remote areas is high compared to the rates permitted to be charged to rural customers, eligible telephone companies receive CHCF-A subsidies.  The CHCF-A program is funded by surcharges assessed against all California telephone customers.  (*Ponderosa, supra*, 197 Cal.App.4th at p. 52.)

The PUC, respondent herein, is the state agency charged with regulating public utilities pursuant to article XII of the California Constitution and the Public Utilities Act (§ 201 et seq.).  (*Clean Energy Fuels Corp. v. Public Utilities Com*. (2014) 227 Cal.App.4th 641, 648 (*Clean Energy*).)  Statutorily, the PUC is authorized to supervise and regulate public utilities and to " 'do all things … which are necessary and convenient in the exercise of such power and jurisdiction' (§ 701); this includes the authority to determine and fix 'just, reasonable [and] sufficient rates' (§ 728) to be charged by the utilities."  (*Southern California Edison Co. v. Peevey* (2003) 31 Cal.4th 781, 792.)  Its power to fix rates and establish rules has been liberally construed.  (*Ibid*.)

In the proceedings below, the PUC's Public Advocate's Office, which was formerly known as the Office of Ratepayer Advocates (ORA), intervened as a party and opposed petitioners' proposals for determining cost of capital.  ORA is an independent office within the PUC that participates in proceedings and is charged with representing ratepayer or customer interests in ratemaking proceedings.  (§ 309.5.)

---

[3] Undesignated statutory references are to the Public Utilities Code.

Introduction to the Cost of Capital

Before delving into the specifics of the parties' positions relating to the cost of capital determination, and in order to make the financial information and terminology more understandable, we believe further elaboration on the concept of the cost of capital would be helpful.

As noted, a utility company's cost of capital, also known as the rate of return, reflects the cost the company must pay to generate capital used for investment in infrastructure and equipment. (See, *Ponderosa*, *supra*, 197 Cal.App.4th at p. 51; see also, § 275.6, subd. (b)(2), (b)(5) & (c)(2).) The parties' briefing to this court expressly acknowledges this basic understanding of the function of cost of capital. As the PUC states in its respondent's brief, the rate of return should be set "at a level that is adequate to enable the utility to attract investors to finance the replacement and expansion of its facilities so it can fulfill its public utility service obligation," which requires "comparing market returns on investments for other companies with similar levels of risk." Similarly, petitioners state in their opening brief as follows: "The 'cost of capital' is a ratemaking component that reflects a utility's costs of generating capital to invest in utility plant. It is also known as the 'rate of return' because it defines the target return on the utility's capital that must be used in setting rates. 'Cost of capital' is a measurement of the cost of obtaining debt and equity financing, and it reflects the amount investors would demand to compensate them for the risks of investing capital in the company."

The above descriptions of the purpose or function of the cost of capital are consistent with the legislative pronouncements in section 275.6, subdivision (c)(2), which require the PUC in administering the CHCF-A program to accomplish the following objectives: "Employ rate-of-return regulation to determine a small independent telephone corporation's revenue requirement in a manner that provides revenues and earnings sufficient to allow the telephone corporation to deliver safe, reliable, high-quality voice communication service and fulfill its obligations as a carrier of last resort in

4.

its service territory, and to afford the telephone corporation a fair opportunity to earn a reasonable return on its investments, attract capital for investment on reasonable terms, and ensure the financial integrity of the telephone corporation." The term "revenue requirement" in the above provision means "the amount that is necessary for a telephone corporation to recover its reasonable expenses and tax liabilities and earn a reasonable rate of return on its rate base." (§ 275.6, subd. (b)(5).) The term "rate base" means "the value of a telephone corporation's plant and equipment that is reasonably necessary to provide regulated voice services and access to advanced services, and upon which the telephone corporation is entitled to a fair opportunity to earn a reasonable rate of return." (§ 275.6, subd. (b)(2).)

Having described the function of the cost of capital, the crucial question is how the cost of capital is reasonably measured or ascertained. The case of *Ponderosa*, *supra*, 197 Cal.App.4th at pp. 51-52, provides a starting point. We observed in that case there are ordinarily three major components or steps in determining the cost of capital: (1) the cost of debt, (2) the cost of equity (i.e., the necessary return to generate equity investment), and (3) the capital structure. (*Id*. at pp. 51-52.) The following is our summary in that case of the cost of capital and other closely-related concepts:

> "The [PUC] examines several cost components in calculating a utility company's revenue requirement. The [PUC] begins by determining the value of the assets that the company has invested in to provide utility service. Property or portions thereof that are unproductive for public utility purposes are excluded. This figure is known as the 'rate base.' [¶] To invest in rate base assets, a utility company raises funds by either issuing debt or selling equity. Costs are associated with each method. The company either has to pay interest to creditors on borrowed funds or pay a portion of profits or dividends to equity investors, i.e., shareholders. This cost is known as the cost of capital. The cost of capital, also known as the rate of return, multiplied by the rate base is one component of the utility company's revenue requirement.
>
> Utility companies usually use a mix of debt financing and equity as a source of funds for their regulated activities. The reason is that, while debt is cheaper to obtain, it increases financial risks to the shareholders. Interest must be paid to

5.

creditors regardless of how the company is doing financially. On the other hand, shareholders expect an annual return that is usually greater than the cost of debt. Accordingly, companies attempt to find a middle ground between all-equity financing and all-debt financing.

The [PUC] determines a utility company's cost of capital in a three-step process. The [PUC] first adopts a reasonable capital structure, i.e., the proportion of debt to equity that a utility company should use to finance its capital needs. Next the [PUC] calculates the company's cost of debt, based on the actual cost of the company's outstanding debt during the most recent period. Third, the [PUC] determines the appropriate return on the equity component of the utility company's capital by examining returns for businesses with comparable risks. Applying the resulting figures to the adopted capital structure produces the weighted cost of capital. This weighted cost of capital becomes the utility company's authorized rate of return on rate base. Alternatively, the [PUC] may simply apply an overall rate of return without regard to a specific capital structure." (*Ponderosa, supra,* 197 Cal.App.4th at pp. 51-52.)

Here, the contesting parties largely adopted the basic framework outlined above. In the proceedings before the PUC, petitioners and ORA agreed that the cost of capital formula should include (i) cost of debt, (ii) cost of equity and (iii) a capital structure from which to calculate a weighted average cost of capital.[4] However, as the PUC decision stated, although the parties agreed on this basic initial formula, "[they] disagree[d] as to the inputs for each of the companies, and whether any adjustments should be made to those inputs." Not only did petitioners and ORA disagree on the proper measure to use for the cost of debt, the cost of equity and the appropriate capital structure, but they also fundamentally disagreed whether *additional risk factors* (or premia) should be applied to increase the cost of equity.

With respect to calculating the *cost of equity* component, petitioners and ORA both used a model known as the Capital Asset Pricing Model (CAPM). Under the CAPM

---

[4] As petitioners accurately summarize: "[A]n accurate cost of capital must account for the interest rate applied to debt (the 'cost of debt'), the return necessary to generate equity (the 'cost of equity'), and the relative proportion of the two upon which the utility must rely (the 'capital structure'). … A combination of these three factors results in the overall cost of capital."

6.

model, one first determines the risk-free rate of investment, usually based on a 20-year U.S. Treasury Bond over a selected time, to which an *equity risk premium* (and other risk premia if applicable) would be added to reach a total cost of equity. According to the PUC decision, the equity risk premium "is the amount of additional return above the risk-free rate that is required to produce a return on equity high enough to attract the necessary capital for the operation."

According to petitioners' expert, Michael Balhoff, the equity risk premium "is the difference between what a risk-free investment … would generate and what stocks in the market over the same period would produce." In applying the CAPM model, ORA's position was that to determine the cost of equity for the rural telephone companies, the only upward adjustment or premium added to the risk-free rate would be the equity risk premium, since that premium would in this case adequately represent "the amount of additional return required to produce a return on equity … high enough to attract the necessary capital." In contrast, petitioners' view was that after the equity risk premium was added to the risk-free rate, several *additional* risk premia should be applied to account for special risk factors such as the small size of the telephone companies, industry risk and regulatory risk. As the PUC noted, petitioners' method, also referred to as a "build-up" CAPM method, purported to "break[] out" or itemize each of the material risk factors into specific premia that, taken together with the risk-free rate, generate the proposed cost of equity.

It is fair to say that the main controversy between petitioners and ORA in the PUC proceedings was whether the cost of equity should be increased, beyond the initial sum of the equity risk premium and the risk-free rate, based on the special or additional risk factors allegedly applicable to petitioners, including the small size of each telephone company and other industry-specific and/or regulatory risks allegedly affecting small rural telephone companies such as petitioners.

7.

As will be seen, the PUC ultimately adopted the two-input approach recommended by ORA on the cost of equity, but also used other corroborating information.

Historical Background – the 1997 Setting of Cost of Capital

Prior to the 2016 issuance of the challenged PUC decision, a 10 percent rate of return for small rural telephone companies had been in effect since 1997. In a series of 1997 PUC cases, the PUC established a "10 percent return on rate base" without regard to each company's actual capital structure at that time. In these cases, the PUC did not specify an exact equity rate of return, but analysis showed it would fall within a range of reasonableness. We note that, in the present case, petitioners and ORA both agree the 10 percent rate of return would indicate an implied cost of equity of approximately 12 percent in the 1997 cases. The 10 percent rate of return or cost of capital set by the PUC in 1997 was not assigned through the application of a rigid formula; rather, the PUC apparently reached an overall judgment that this rate of return would adequately compensate shareholders for their risk and would be fair and reasonable to ratepayers and shareholders. (See, e.g., *In re Sierra Telephone Co., Inc.* (1997) 71 Cal.P.U.C.2d 506; *In re Foresthill Telephone Co.* (1997) 71 Cal.P.U.C.2d 530; *In re Calaveras Telephone Co.* (1997) 71 Cal.P.U.C.2d 552; *In re Ducor Telephone Co.* (1997) 71 Cal.P.U.C.2d 574; *In re California-Oregon Telephone Co.* (1997) 71 Cal.P.U.C.2d 596.)

Petitioners' Application to the PUC

In 2015, the PUC authorized a consolidated proceeding to examine the cost of capital for each of ten small telephone companies that were CHCF-A program recipients. In September 2015, the ten companies applied to the PUC to determine cost of capital. Petitioners herein are three of the original ten applicants.[5]

---

[5] For convenience, we sometimes refer to the application as petitioners' application, even though there were seven additional applicants.

8.

The application proposed that the PUC should establish the cost of capital for each of the applicant telephone companies using a cost of equity of 18.5 percent (based on premia for special risks of investment in small rural telephone companies), a hypothetical capital structure of 70 percent equity to 30 percent debt, and the actual cost of debt for each company. Although the application called for use of the actual cost of debt for each company, it was noted that if a cost of debt of 5.5 percent were applied, the applicants' proposal would result in a 14.6 percent weighted average cost of capital for each company. This proposal represented a considerable increase from the previous figure of 10 percent.

The application asserted that although the PUC had been using a 10 percent overall rate of return on rate base since 1997, the 10 percent rate of return was no longer adequate in light of significantly increased risks of investment in rural telephone companies. The application and supporting evidence pointed to several business and investment risk factors, including market or competition changes (e.g., wireless alternatives), regulatory changes potentially affecting funding derived from federal and state support programs, and the small size of the rural telephone companies. Balhoff's written testimony was attached in support of the application, including his financial analysis regarding the cost of capital. In particular, Balhoff explained his assessment that risk premia should be applied to increase the cost of equity based on such special risk factors as company size, industry-specific risk and regulatory risk, among others. The risk premia figures Balhoff asserted should be applied in computing the cost of equity included a proposed 5.78 percent "size" premium based on risks associated with the telephone companies' small size, as well as an industry-specific risk premium of between .30 and .42 percent. In the event a size premium were not approved, Balhoff contended at least a 2 percent premium should be added to account for regulatory risk.

9.

ORA's Response to Petitioners' Application

On February 12, 2016, ORA filed objections to the cost of capital proposals in petitioners' application. ORA's filing was entitled "Report and Recommendation on the Cost of Capital for Independent Small Local Exchange Carriers." ORA asserted the requested cost of equity of 18.5 percent was unreasonable and excessive, and ORA also disputed the claim that special risk premia should be applied in calculating the cost of equity. ORA recommended the PUC use only two inputs under the CAPM model to determine cost of equity – i.e., the risk-free rate and the equity risk premium. ORA asserted that, under the two inputs for calculating cost of equity, and using estimates ORA claimed were reasonable, the cost of equity for each company would be 8.79 percent. Additionally, ORA proposed the PUC use the actual debt costs and the actual capital structure of each telephone company, which would then produce an individualized weighted cost of capital for each company. Under ORA's calculations, the weighted costs of capital for each company would range from 6.24 percent to 7.67 percent. Finally, ORA asserted the risks alluded to by the small rural telephone companies were largely mitigated due to revenues or subsidies received from the state's CHCF-A program and the federal Universal Service Fund (USF).

In summary, comparing petitioners' application and ORA's response, petitioners requested a cost of capital determination for each company of approximately 14.6 percent, while ORA argued the PUC should adopt a much lower cost of capital for each company, ranging from 6.24 percent to 7.67 percent. As noted, the major source of disagreement was with respect to the cost of equity component.

Other Evidence and Argument in the PUC Proceedings

On March 11, 2016, the small rural telephone companies served Balhoff's written rebuttal testimony responding to ORA's analysis and critiquing ORA's evidence. In general, Balhoff's rebuttal testimony asserted ORA's recommendations were inconsistent with prevailing valuation methodologies and failed to properly reflect the actual risks

10.

facing the small rural telephone companies.  Balhoff's rebuttal testimony reiterated there is evidence to support risk premia associated with small company size and industry-specific or regulatory risks, and also argued subsidy programs such as the CHCF-A program did not shield the companies from such risks.  Further, Balhoff's rebuttal testimony indicated ORA's use of only two inputs, the risk-free rate and equity risk premium, in determining cost of equity was unreasonable because it would mean "[i]ndependent Small LEC's have equity costs that are no different from the equity costs in the general market[,]" a proposition that "has never been endorsed by the financial community and has never been supported by a regulatory body, to the best of my knowledge."

On April 7 and 8, 2016, an evidentiary hearing was conducted before an administrative law judge in San Francisco.  Twenty-three exhibits were received into evidence during the evidentiary hearing, and petitioners and ORA each had their expert witnesses appear and testify.  Balhoff was petitioners' sole expert, while ORA's experts were its staff members Charlotte Chitadje, Roy Keowen and Patrick Hoglund.

On May 13, 2016 and June 3, 2016, after all the evidence was received, petitioners and ORA filed their respective opening and reply briefs before the PUC.  A proposed decision was issued by the administrative law judge, and the parties filed their comments in response to the proposed decision.

The PUC Decision

On December 20, 2016, the PUC issued its final decision in 16-12-035, adopting a range of costs of capital (i.e., rates of return) for petitioners and the other rural telephone companies.  The costs of capital established for petitioners were as follows:  The Ponderosa Telephone Co. – 8.44 percent; Sierra Telephone Company, Inc. – 9.22 percent; and Volcano Telephone Company – 9.12 percent.  The PUC calculated these costs using a hypothetical capital structure of 70 percent equity to 30 percent debt, a 10.8 percent cost of equity, and the actual debt costs for each of the companies.

11.

In computing cost of equity, the PUC adopted ORA's recommended two input methodology (i.e., the risk-free rate and the equity risk premium), and rejected the petitioners' recommended approach of applying additional risk premia to increase the cost of equity. In its decision, the PUC defined the equity risk premium as "the amount of additional return above the risk-free rate that is required to produce a return on equity high enough to attract the necessary capital for the operation." The PUC explained the methodology it adopted as follows: "We agree with ORA that Applicants have failed to show that more than two components are justified in this case to calculate a reasonable cost of equity. The Commission has traditionally used two inputs to the CAPM, the equity risk premium and the risk-free rate, to calculate the cost of equity for a regulated utility. We have traditionally held there should be no adjustments to the financial modeling results for other financial, business or other regulatory risks because the financial modeling results already include those risks. We have not been convinced that we should deviate from this method in this case."

The conclusions of law enumerated in the PUC decision included the following statements: "1. The legal standard for setting the fair cost of capital has been established by the United States Supreme Court in the *Bluefield* and *Hope* cases. [¶] 2. This decision has considered all reasonable observable factors to develop a full picture of the risks facing the Small LECs. [¶] … [¶] 8. The Commission has traditionally used two inputs to the [CAPM], the equity risk premium and the risk-free rate, to calculate the cost of equity for a regulated utility. [¶] 9. It is the application of informed judgment, not the precision of quantitative financial models, which is the key to selecting a specific cost of capital. [¶] 10. Company-wide factors such as risks, capital structures, and debt costs are considered in arriving at a fair cost of capital. [¶] 11. There should be no adjustments to the financial modeling results for other financial, business or other regulatory risks because the financial modeling results already include those risks."

Denial of Request for Rehearing

On January 19, 2017, petitioners filed an application to the PUC for rehearing of the PUC decision, asserting error in several respects. Petitioners claimed the PUC's refusal to recognize the additional risks facing the rural telephone companies resulted in an unreasonably low rate of return in violation of constitutional principles. Additionally, petitioners argued that, in light of the evidentiary record, the PUC's decision rejecting any risk premia (other than the equity risk premium) was arbitrary and capricious, and unsupported by substantial evidence.

On December 18, 2017, in decision No. 17-12-029, the PUC denied petitioners' request for a rehearing of decision No. 16-12-035. In denying rehearing, the PUC held petitioners' rehearing application failed to show the PUC decision resulted in an unconstitutional taking or was the result of arbitrary and capricious decision-making. Further, the PUC noted it was entitled to rely on ORA's evidence and analysis, rather than on that of petitioners, and pointed out that petitioners' analysis and evidence were not disregarded but were deemed "not persuasive." Thus, according to the PUC, the rehearing application showed no more than a difference of opinion, rather than legal error. For these reasons, the request for rehearing was denied.

Petitioners' Petition for Writ of Review

On January 18, 2018, petitioners filed a petition for writ of review to this court, challenging the PUC decision regarding cost of capital (16-12-035) and the denial of rehearing (17-12-029). The grounds for seeking our review were (i) the PUC allegedly violated petitioners' constitutional rights because, in determining the cost of capital, it failed to consider specific and well-documented risks facing petitioners; and (ii) the PUC's conclusions relating to the specific risks facing petitioners were arbitrary and capricious, unsupported by substantial evidence in the record, and refuted by compelling evidence presented by petitioners.

13.

On March 13, 2018, based on the petition, briefing and exhibits on file, we ordered that a writ of review issue, and informed the parties this court would review PUC decision Nos. 16-12-035 and 17-12-029. We ordered the PUC to certify the administrative record to this court and informed the parties oral argument would be held at a date and time to be announced.

## DISCUSSION

### I.     Standard of Review

Since the cost-of-capital determination by the PUC was incidental to ratemaking, section 1757 governs the scope of our review. Under that section, "the review by the court shall not extend further than to determine, on the basis of the entire record …, whether any of the following occurred: [¶] (1) The [PUC] acted without, or in excess of, its powers or jurisdiction. [¶] (2) The [PUC] has not proceeded in the manner required by law. [¶] (3) The decision of the [PUC] is not supported by the findings. [¶] (4) The findings in the decision of the [PUC] are not supported by substantial evidence in light of the whole record. [¶] (5) The order or decision of the [PUC] was procured by fraud or was an abuse of discretion. [¶] (6) The order or decision of the [PUC] violates any right of the petitioner under the Constitution of the United States or the California Constitution." (§ 1757, subd. (a).)

Because the PUC is not an ordinary administrative agency, but a constitutional body with broad legislative and judicial powers, its decisions are presumed valid. (*Ponderosa*, *supra*, 197 Cal.App.4th at p. 56.) Thus, a party challenging a PUC decision has the burden of proving it suffers from prejudicial error. (*Pacific Gas & Electric Co. v. Public Utilities Com.* (2015) 237 Cal.App.4th 812, 838 (*PG&E*).) The presumption of correctness of the PUC's findings has consistently been described by our Supreme Court as a "strong" presumption. (*City and County of San Francisco v. Public Utilities Com.* (1985) 39 Cal.3d 523, 530 (*San Francisco*); *Pacific Tel. & Tel. Co. v. Public Util. Com.* (1965) 62 Cal.2d 634, 647 (*PacTel*) ["[s]trong presumption of the correctness of the

14.

findings … of the commission, which may choose its own criteria or method of arriving at its decision, even if irregular, provided unreasonableness is not 'clearly established' "].)

It is for the agency to weigh the preponderance of conflicting evidence, and its findings are not open to attack for insufficiency if they are supported by any reasonable construction of the evidence. (*Clean Energy, supra,* 227 Cal.App.4th at p. 649.) Thus, the PUC's factual findings based on conflicting evidence or on undisputed evidence from which conflicting inferences may reasonably be drawn are final and not subject to review. (*San Francisco*, *supra*, 39 Cal.3d at p. 530.)[6] In other words, if the PUC's findings are supported by any substantial evidence, they may not be set aside. (*Ibid*.) Accordingly, "[t]o accomplish the overturning of a Commission finding for lacking the support of substantial evidence, the challenging party must demonstrate that based on the evidence before the Commission, a reasonable person could not reach the same conclusion. [Citations.] It is for this reason that the Commission's factual findings are almost always treated as 'conclusive' [citation], 'final and not subject to review.' " (*PG&E, supra,* 237 Cal.App.4th at p. 839; accord, *SFPP, L.P. v. Public Utilities Commission* (2013) 217 Cal.App.4th 784, 794 (*SFPP*) [courts may reverse agency's decision only if, based on the evidence before the agency, no reasonable person could reach the conclusion it did].)

To the extent a challenged PUC decision involves the interpretation or application of the Public Utilities Code or regulations regarding a matter within the agency's special expertise, reviewing courts extend considerable deference to the PUC's conclusions, and ordinarily such a decision will not be disturbed unless it fails to bear a reasonable relation

---

**6** The only exception to this rule is where findings and conclusions are drawn by the PUC from undisputed evidence and the evidence is such that conflicting inferences may not reasonably be drawn. (*PacTel*, *supra*, 62 Cal.2d at p. 647.) In that case, a question of law is presented. (*Ibid*.)

to statutory purposes and language.  (*PG&E, supra*, 237 Cal.App.4th at pp. 839-840.)  In the end, however, questions of statutory or regulatory construction are legal questions decided by the courts.  (*Id*. at p. 840.)

Where a PUC decision is challenged on the ground it violates a constitutional right, the reviewing court must exercise independent judgment on the law and the facts, and the PUC's findings or conclusions material to the constitutional question are not final.  (§ 1760.)  Nevertheless, "we may not substitute our own judgment 'as to the weight to be accorded evidence before the Commission or the purely factual findings made by it.'"  (*SFPP, supra,* 217 Cal.App.4th at p. 794, citing *Goldin v. Public Utilities Commission* (1979) 23 Cal.3d 638, 653; accord, *PG&E, supra*, 237 Cal.App.4th at p. 838 [even where constitutional claims are raised, reweighing of evidence and testimony ordinarily not permitted].)

## II.    Overview of Constitutional Principles

A series of United States Supreme Court cases declare the basic constitutional principles relevant to the rate-of-return or cost of capital determinations in this case, including *Bluefield Water Works & Improvement Co. v. Public Service Commission of West Virginia* (1923) 262 U.S. 679 (*Bluefield*), *Federal Power Commission v. Hope Natural Gas Co.* (1944) 320 U.S. 591 (*Hope*), and *Duquesne Light Co. v. Barasch* (1989) 488 U.S. 299 (*Duquesne*).  As the PUC decision itself acknowledges, "[t]he legal standard for setting the fair cost of capital has been established by the United States Supreme Court in the *Bluefield* and *Hope* cases."  We begin by summarizing the constitutional principles announced in the above cases.

In *Bluefield*, *supra*, 262 U.S. 679, a utility company contended the rate of return set by the state commission in that case was too low and confiscatory.  (*Id*. at p. 692.)  In explaining the relevant constitutional standard for rate of return determinations, the Supreme Court stated as follows:  "What … rate will constitute just compensation depends upon many circumstances and must be determined by the exercise of a fair and

enlightened judgment, having regard to all relevant facts.  *A public utility is entitled to such rates as will permit it to earn a return on the value of the property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties*; but it has no constitutional right to profits such as are realized or anticipated in highly profitable enterprises or speculative ventures.  The return should be reasonably sufficient to assure confidence in the financial soundness of the utility and should be adequate, under efficient and economical management, to maintain and support its credit and enable it to raise the money necessary for the proper discharge of its public duties.  A rate of return may be reasonable at one time and become too high or too low by changes affecting opportunities for investment, the money market and business conditions generally." (*Id*. at pp. 692-693, italics added.)  In the same decision, the Supreme Court noted the legal consequences of a failure to set a reasonable rate of return:  "Rates which are not sufficient to yield a reasonable return on the value of the property used at the time it is being used to render the service are unjust, unreasonable and confiscatory, and their enforcement deprives the public utility company of its property in violation of the Fourteenth Amendment." (*Id*. at p. 690.)

Similarly, in *Hope*, *supra*, 320 U.S. 591, the Supreme Court articulated the relevant principles as follows:  "[T]he fixing of 'just and reasonable' rates, involves a balancing of the investor and the consumer interests.  Thus we stated in the *Natural Gas Pipeline Co*. case that 'regulation does not insure that the business shall produce net revenues.' [Citation.]  But such considerations aside, the investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated.  From the investor or company point of view it is important that there be enough revenue not only for operating expenses but also for the capital costs of the business. … By that standard *the return to the equity owner should be commensurate*

*with returns on investments in other enterprises having corresponding risks*. That return, moreover, should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." (*Hope*, *supra*, 320 U.S. at p. 603, italics added.) The *Hope* case concluded that the "fair value" system was not the only constitutionally acceptable method of fixing utility rates, explaining as follows: "Rates which enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed certainly cannot be condemned as invalid, even though they might produce only a meager return on the so-called 'fair value' rate base." (*Id*. at p. 605.)

More recently, in *Duquesne*, *supra*, 488 U.S. 299, the Supreme Court stated the guiding principle in rate cases has been "that the Constitution protects utilities from being limited to a charge for their property serving the public which is so 'unjust' as to be confiscatory." (*Id*. at p. 307.) Further, the Supreme Court in *Duquesne* went on to reiterate the principle in *Hope* and *Bluefield* that "[o]ne of the elements always relevant to setting the rate under *Hope* is the return investors expect given the risk of the enterprise. [*Hope*, *supra*, 320 U.S.] at p. 603 ('[R]eturn to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks'); [*Bluefield, supra,* 262 U.S. at pp.] 692-693 ('A public utility is entitled to such rates as will permit it to earn a return … equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties.')." (*Duquesne*, *supra*, 488 U.S. at pp. 314-315.)

*Duquesne* also affirmed the rule articulated in *Hope* that no particular method or formula is constitutionally required. (*Duquesne*, *supra*, 488 U.S. at pp. 310, 314.) "[A]n otherwise reasonable rate is not subject to constitutional attack by questioning the theoretical consistency of the method that produced it." (*Id*. at p. 314.) " 'It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot

be said to be unreasonable, judicial inquiry…is at an end.  The fact that the method employed to reach that result may contain infirmities is not then important.'"  (*Id*. at p. 310, quoting *Hope*.)  Other Supreme Court cases are to the same effect.  (See, e.g., *Verizon Communications, Inc. v. F.C.C.* (2002) 535 U.S. 467, 525 (*Verizon*) [noting general rule that any question about the constitutionality of rate setting is raised by rates, not methods]; *Federal Power Com. v. Natural Gas Pipeline Co*. (1942) 315 U.S. 575, 586 (*Federal Power*) ["The Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas ….  If the Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end"].)

## III.    PUC Decision Not Shown to be Unconstitutional

Petitioners contend the cost of capital determination was so unreasonably low it was confiscatory (i.e., a taking) in violation of their constitutional rights.

The burden is on petitioners to show the rate of return (or cost of capital) established by the PUC was clearly confiscatory.  That is, there must be a clear showing the rate of return was "*so 'unjust' as to be confiscatory*," such as by demonstrating the rate is so unreasonably low it will threaten the utility's financial integrity by impeding the utility's ability to raise future capital or adequately compensate current equity holders. (*Duquesne*, *supra*, 488 U.S. at pp. 307, 312, italics added; *Hope*, *supra*, 320 U.S. at p. 605; see, *Verizon*, *supra*, 535 U.S. at p. 524.).  A rate of return lower than the utility asserts is necessary may nevertheless be reasonable or within a range of reasonableness, constitutionally speaking, if it is " 'higher than a confiscatory level.' " (*Duquesne*, *supra*, 488 U.S. at p. 308; *Federal Power, supra,* 315 U.S. at pp. 585-586 [explaining there is a zone of reasonableness within which the Commission is free to fix a rate as long as it is higher than a confiscatory rate].)

As our state's highest court put it:  "The standard is that of reasonableness.  One challenging a rate-fixing order on constitutional grounds of confiscation is charged with

the burden of showing that the evidence does not support the commission's findings and that the rate as finally fixed is unreasonable and will result in confiscation. Such burden is coupled with a strong presumption of the correctness of the findings and conclusions of the commission, which may choose its own criteria or method of arriving at its decision, even if irregular, provided unreasonableness is not 'clearly established. Thus responsibility for rate fixing, insofar as the law permits and requires, is placed with the commission, and unless its action is clearly shown to be confiscatory the courts will not interfere.' " (*PacTel*, *supra*, 62 Cal.2d at p. 647; see also pp. 656-658.) Unless the party challenging the PUC decision demonstrates the amount fixed as a fair rate of return is "clearly unreasonable," this court may not substitute its judgment for that of the PUC. (*Southern Cal. Gas Co. v. Public Utilities Com.* (1979) 23 Cal.3d 470, 484.)

Moreover, the facts presented must clearly show the PUC's decision denied petitioners their constitutional rights. "[M]erely asserting in general language that rates are confiscatory is not sufficient …. [I]n order to invoke constitutional protection, the facts relied on must be specifically set forth and from them it must clearly appear that the rates would *necessarily* deny to plaintiff just compensation and deprive it of its property without due process of law." (*Public Service Com'n of Montana v. Great Northern Utilities Co.* (1933) 289 U.S. 130, 136-137, italics added.)

Here, petitioners contend they were deprived of a reasonable rate of return under the standards set forth in *Bluefield*, *Hope* and *Duquesne*. Petitioners argue that because the PUC did not adopt their methodology of applying additional risk premia relevant to small rural carriers, or did not otherwise specifically account for the risk factors itemized by petitioners, they have been denied a constitutionally reasonable rate of return and, therefore, the rate of return was confiscatory. On the record before us, we disagree.

As more fully discussed in part IV of this opinion, the PUC's methodology of calculating the cost of equity component of the cost of capital under a two-step approach (i.e., risk-free rate plus an equity risk premium) while using corroborating data to check

20.

the reasonableness of the outcome, was not so patently flawed or irregular that we must reject it out of hand. It bears repeating that an otherwise reasonable rate is not subject to constitutional attack by questioning the consistency of the method that produced it. (*Duquesne*, *supra*, 488 U.S. at p. 314.) Rather, if the total effect of the rate order cannot be said to be unreasonable, judicial inquiry is at an end, and the fact the method employed has serious infirmities is not then important. (*Id*. at p. 310; see, *Verizon, supra,* 535 U.S. at p. 524 [questions about the constitutionality of rate setting is raised by rates, not methods]; *Federal Power, supra,* 315 U.S. at p. 586.) For these reasons, the PUC's methodology does not adequately establish petitioners' claim.

Additionally, petitioners rely on the fact they presented evidence of certain business or investment risks that the PUC did not incorporate or account for in its cost of capital analysis. However, as will be seen in part IV, after weighing all of the evidence before it, including that of ORA and petitioners, the PUC appears to have reached a cost of capital result that was nonarbitrary and within a range of reasonableness. (See *Federal Power, supra,* 315 U.S. at p. 586 ["If the Commission's order, as applied to the facts before it and viewed in its entirety, produces no arbitrary result, our inquiry is at an end"].) Additionally, in regard to petitioners' precise claim the cost of capital was so unjust as to be confiscatory in its impact, we agree with the PUC's argument that petitioners' evidence was largely of a generalized or theoretical nature.[7]

We conclude petitioners have not clearly demonstrated the PUC's cost of capital determination, utilizing a cost of equity of 10.80 percent, was so unjust as to be

---

[7] The PUC also notes the constitutional challenge is arguably premature because cost of capital is only one component of eventual ratemaking, and therefore it cannot be definitively shown at this point in the process that the impact will be confiscatory. Since we conclude petitioners' constitutional challenge falls short, we need not reach the alternative argument of prematurity.

21.

confiscatory, or that it was clearly unreasonable or arbitrary under all the circumstances. Petitioners have not met their burden of establishing a constitutional violation.

## IV. PUC Decision Not Arbitrary, Capricious or Lacking Evidentiary Support

Petitioners' claim that the PUC's decision on the cost of equity component of the cost of capital "rest[ed] upon arbitrary and capricious reasoning that ha[d] no foundation in record evidence or legal precedent." In particular, petitioners argue the PUC's refusal to apply the additional risk premia (i.e., for the small size of the companies, and industry-specific or regulatory risks) to increase the rate of petitioners' cost of equity was not supported by substantial evidence in the record or reasoned argument. Petitioners point out that the PUC's rejection of these risk factors was particularly unreasonable in light of the constitutional standard that rate of return determinations should be commensurate with returns on investments in other enterprises having corresponding risks. Petitioners reiterate that their cost of equity analysis was backed by Balhoff's expert testimony presenting the evidentiary basis for the adoption of additional risk premia.

The PUC responds that it reached a reasonable decision on the cost of equity which considered and weighed all the evidence, but ultimately found unpersuasive petitioners' expert's testimony that the several additional risk premia should have been applied to the cost of equity in this case. Further, the PUC argues it was not required to adopt petitioners' method or formula for calculating the cost of equity, and in any event the result reached was within a range of reasonableness and was supported by evidence in the record and reasoned argument. We conclude petitioners have failed to meet their burden of demonstrating the PUC's determination was arbitrary, capricious or lacking evidentiary support.

As noted, section 1757 requires that PUC decisions be supported by findings, and the findings must be "supported by substantial evidence in light of the whole record."

(§ 1757, subd. (a)(3) & (4).)[8] A party challenging a PUC finding for lack of substantial evidence must demonstrate that, based on the evidence before the PUC, a reasonable person could not reach the same conclusion. (*PG&E*, *supra*, 237 Cal.App.4th at p. 839.) Further, if an agency decision is shown to be "arbitrary" (see *Woodbury v. Brown-Dempsey* (2003) 108 Cal.App.4th 421, 438) or to "exceed[] the bounds of reason," an abuse of discretion will be found. (See *San Pablo Bay Pipeline Co. LLC v. Public Utilities Com.* (2013) 221 Cal.App.4th 1436, 1460; § 1757, subd. (a)(5).) As our Supreme Court observed in another context, arbitrary decision-making is precluded: "A court will uphold the agency action unless the action is arbitrary, capricious or lacking in evidentiary support." (*California Hotel and Motel Assn. v. Industrial Welfare Com.* (1979) 25 Cal.3d 200, 212 [a rational connection needed between the agency's consideration of relevant factors, the choice made, and the purposes of the enabling statute].) We also keep in mind the "strong presumption of the correctness of the findings and conclusions of the commission, which may choose its own criteria or method of arriving at its decision, even if irregular, provided unreasonableness is not 'clearly established.' " (*PacTel, supra*, 62 Cal.2d at p. 647.)

In deciding whether there was substantial evidence to reasonably support the PUC's decision-making on these matters, we will review the parties' arguments and evidence regarding the separate risk premia asserted by petitioners, including (1) the small size of the companies, (2) industry-specific risk, and (3) regulatory risk.

---

[8] Findings of fact and conclusions of law must be separately stated in PUC decisions, which " 'afford[s] a rational basis for judicial review and assist[s] the reviewing court to ascertain the principles relied upon by the commission and to determine whether it acted arbitrarily …." (*California Manufacturers Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 251, 258-259; § 1705.)

A. <u>Alleged Risk Premia for Small Size of Telephone Companies</u>

Petitioners requested a risk premium of 5.78 percent be added to the cost of equity due to special risks relating to the small size of the telephone companies. Balhoff presented his expert opinion based on certain studies that investors "*require* a return for smaller companies that exceeds that predicted in the CAPM for larger companies." Balhoff stated that a "premium is appropriately added to the equity return to reflect market-based risk that is greater for smaller companies compared with larger companies." In support of this conclusion, he explained that typically larger companies have the advantages of scale and are therefore more efficient than smaller companies. Among other things, he noted that "[g]reater size permits carriers to spread marginal costs over a large number of customers, and small firms are severely disadvantaged in managing their costs. As a result, small carriers require more federal and state support to supplement their investments and operations, while keeping rates within reasonable bounds." Further, according to Balhoff, in addition to having greater efficiencies that tend to reduce operating costs and allow diversification of operations, larger companies (including larger LEC's) generally have "extensive access to publicly-traded equity capital and cost-effective debt capital." For these reasons, Balhoff stated: "Smaller companies are less able to deal with significant events that affect revenues and cash flows than larger companies. For example, the loss of sales from a few large customers would exert a far greater effect on a small company …." (Quoting Roger A. Morin, New Regulatory Finance (Vienna, VA; Public Utilities Reports, Inc., 2006), at p. 187.)

Petitioners also referred to the 1997 PUC decisions that, in setting a 10 percent return on rate-base for petitioners, mentioned the potential effect of company size. For example, the 1997 PUC decision relating to Sierra Telephone Company, Inc., acknowledged that consistent with the *Hope* case, the "adopted return on rate base" must provide "an opportunity to earn an equity return equivalent to returns on alternative investments in other firms with comparable risk." (*In re Sierra Telephone Co.* (1997)

24.

71 Cal.P.U.C.2d 506, 97 Cal. PUC LEXIS 1245, at p. *29.)  The applicant had argued a 30 percent increase to the cost of equity would be warranted due to its small company size.  On that issue, the 1997 PUC decision stated as follows:  "We do not necessarily concur with applicant's 30% risk premium to compensate applicant for its small size as compared to the large companies in the study group.  However, we do concur that applicant's risk is impacted by its small size in relation to the large size of the companies in the study group." (*Id*. at p. *32.)  According to petitioners herein, even though the PUC did not adopt a specifically quantifiable size premium in its 1997 decision reaching a 10 percent overall return on rate base, it at least acknowledged it was a factor to be considered.[9]

In response to the above evidence, ORA submitted its own report and analysis prepared by three of its staff members, each of whom possessed expertise to address issues discussed in distinct sections of the report.  At the PUC administrative hearing at which oral testimony was presented, the three ORA staff members each adopted a portion of the report as his or her own testimony.  ORA's position on cost of equity in the report was that petitioners' proposal of 18.5 percent cost of equity was excessive and unreasonable because, among other things, it did not account for significant market changes that have occurred since 1997 (the year when the PUC adopted 10% as the cost of capital, reflecting an implied average cost of equity of 12.15% at that time), including that regulated utilities' return on equity and cost of debt have been steadily declining for the last two decades.  Under all the circumstances, ORA believed its recommended cost of equity of 8.79 percent would more reasonably reflect investor's expectations.  The

---

[9] The PUC's response to the above-quoted language from its 1997 decision is that no size premium was actually adopted by it in the 1997 decision, nor ever, and even if the 1997 decisions could be so construed, the PUC is not bound by its past decisions.  (See *Re Pacific Gas & Elec. Co*. (1988) 30 Cal.P.U.C.2d 189, 223.)

8.79 percent figure was based on a recommended equity risk premium of 5.88 percent[10] and a recommended cost of debt of 2.91 percent, with no additional risk premia.

ORA's report specifically criticized Balhoff's recommendation to apply an additional premium for the purported small firm risk. ORA referenced a 2013 FCC staff report that had expressly declined to apply a risk premium based on small company size, and one of ORA's exhibits was a 2011 study of financial literature arguably calling the small firm effect into question.[11] However, ORA's main assertion was that a size premium was unnecessary since a fair cost of equity could be reached by the method of adding the risk-free rate and the equity risk premium, and in any event the CHCF-A and USF programs provided additional protection to these small telephone companies against revenue risks.

ORA asserted its total cost of equity recommendation was corroborated by a proxy group of communication firms derived from the 2013 FCC staff report and by data collected in a university study relating to the telecommunications services market in 2014. Additionally, ORA pointed out that petitioners have apparently had no difficulty earning their authorized rate of return, notwithstanding petitioners' insistence that the return on equity should be set much higher than previously. In this regard, ORA noted that during the past five years, petitioners earned an average rate of return of 9.449 percent, which is very close to the authorized rate of return of 10 percent, with an average return on equity during that period of 11.973 percent. ORA also noted that a

---

[10] ORA's equity risk premium of 5.88 percent was based on the 2013 Federal Communications Commission (FCC) staff report averaging equity premiums over a period of many decades, and, according to ORA, is also within the range of (and slightly above) the average implied equity premium of 5.13 percent reflected in the PUC's 1997 Small LEC decisions.

[11] The 2011 study was entitled, "A Literature Review of the Size Effect," by Michael A. Crain.

2016 FCC order endorsed the approach taken in the 2013 FCC staff report and also found a rate of return in the range of 7.12 percent to 9.01 percent to be reasonable.[12]

In his written rebuttal testimony, Balhoff criticized ORA's reliance on the 2013 FCC staff report because, among other reasons, (i) the proxy group used was allegedly different from the very small rural LEC's in this case, (ii) the 2013 FCC staff report's recommendation not to include a size premium was conclusory and, in any event, was apparently limited to the record before the FCC at that time, and (iii) the 2011 study of the literature addressing company size effect allowed that there may still be a size effect in the smallest companies, which was the case here. Balhoff claimed it was inapt for ORA to rely on declines in rates of return for water and energy companies, since petitioners face risks these other types of utilities do not. Petitioners also criticized ORA's "selective reading" of the FCC's recommendations on cost of capital in the 2016 FCC order, which had indicated a rate of return that would taper down to 9.75 percent over a period of several years.

The oral testimony presented at the administrative hearing included cross-examination of the experts, including further consideration of the evidence relied on by petitioners and ORA in their analyses of the effect of small company size. During ORA's cross-examination of Balhoff, ORA introduced evidence Balhoff previously had testified in another forum that, in some contexts, a smaller firm breaking off from a larger one might be operated with more focus and efficiency. Patrick Hoglund was ORA's expert witness at the hearing regarding cost of equity. On cross-examination, Hoglund agreed

---

[12] The 2013 FCC staff report and the 2016 FCC order are more fully described in the PUC decision in this case, respectively, as follows: (1) FCC Wireline Competition Bureau Staff Report "Prescribing the Authorized Rate of Return" (the 2013 FCC staff report) DA 13-111, WC Docket No. 10-90, May 16, 2013; and (2) In re Connect America Fund, ETC Annual Reports and Certifications, and Developing a Unified Intercarrier Compensation Regime, FCC Order 16-33 at ¶ 300, WC Docket No. 10-90, WC Docket No. 14-58, CC Docket No. 01-92 (March 30, 2016) (the 2016 FCC order).

"regulatory" risk is something that should be considered, but he believed it was adequately mitigated by the CHCF-A program. He was aware of the standards in the *Bluefield* and *Hope* cases as overarching goals, even though his analysis in the ORA report did not overtly address those case standards as such, but simply pursued what would be a fair and reasonable cost of equity. He also acknowledged on cross-examination that the proxy group selected from the FCC report for estimating cost of equity involved larger communication companies, but he explained he was mainly referencing them as "a check" on his return on equity computations.

The PUC, after having weighed and considered all the evidence and argument on this issue, concluded as follows in the PUC decision:

> "We are not persuaded the evidence submitted supports a market risk premium specifically based on small firm effects. Applicants cite to some financial literature to support [their] claim that relatively small and privately-held companies have a higher cost of capital than relatively large companies. However, even if the literature supports the premise that size effects [d]o exist in the smallest firms, the analysis fails to isolate and weigh the specific advantages and disadvantages of the Small LECs rate-of-return regulatory classification, and thus does not necessarily apply to the Small LECs in this application. … In evaluating the issues raised in Applicants' testimony we find those issues to be stated in a general or hypothetical way. Applicants did not apply those general or hypothetical examples to their specific circumstances and situations, and thus we cannot determine if the general assertions apply to them. Further, the record does not demonstrate in a quantifiable way how a Small LEC that is regulated as a rate-of-return carrier compares to the typical small or 'microcap' firm that operates in the U.S. economy as a whole. Accordingly, Applicants have failed to carry their burden to show that Applicants' risks are impacted by their small size in a way that would justify a specific size premium in this case." (Fns. omitted.)

In its decision on this issue, the PUC also observed it is required to provide subsidies under the CHCF-A program sufficient to meet the revenue requirements for each small LEC. These subsidies provide a means to address some of the possibilities indicated by applicants; and while the CHCF-A program does not eliminate all business risk to the small LECs, it helps to "mitigate the business risk these companies face." In

28.

the PUC's regulatory assessment, the state subsidy programs[13] provide "a sounder regulatory structure balancing utility incentives and customer costs than we could achieve through the provision of an adjustment for firm-size effects to the cost of capital for the Small LECs."

Based on the foregoing summary, and upon our consideration of the entire record, we conclude the PUC's decision to not include a special risk premium for the purported small-company size effect was not arbitrary, capricious or unsupported by substantial evidence. Rather, it appears to us the PUC carefully weighed and considered all of the evidence and circumstances presented and reached a rational conclusion. As noted in our summary above, the evidence before the PUC included ORA's evidence (i) questioning the small size effect and (ii) arguably corroborating through a variety of data comparisons (e.g., FCC reports) that the cost of equity could be fairly and reasonably ascertained in this particular case by applying appropriate inputs for the risk-free rate and the equity risk premium without warranting the addition of a special risk premium for small company size. Moreover, in weighing and evaluating petitioners' evidence, the PUC was entitled, in this its field of expertise, to conclude such showing was not convincingly applicable to these small rate-of-return telephone companies.

We are unable to conclude that, on this record, no reasonable person could have made the determination the PUC did. (See, *Clean Energy, supra,* 227 Cal.App.4th at p. 649.) Moreover, we do not reweigh the evidence. In view of the strong presumption of validity with respect to the PUC's decisions, and in light of the entire record, we conclude petitioners have not met their burden of affirmatively demonstrating that the

---

[13] The PUC noted that, under section 275.6, the CHCF-A subsidy is an "after-the-fact" type of calculation: "We calculate the revenue requirement first and then the CHCF-A provides subsidies to meet that revenue requirement if it is not already being met through rates. The calculated revenue requirement includes the cost of capital. Thus, while it does not eliminate all business risk to the Small LECs, the presence of the CHCF-A subsidies mitigates the business risk these companies face."

PUC, in its refusal to include a small-firm risk premium, committed prejudicial error. (*PG&E, supra,* 237 Cal.App.4th at pp. 838-839 [summarizing burden in challenging PUC findings].)

B. Alleged Industry Risk Premium

Petitioners also sought an industry-specific risk premium, apparently premised on the added risk above the general equity market of investing in the telecommunications industry, due to such factors as changes in technology, competition and other forces. Focusing on a proxy group of selected companies, Balhoff calculated a 1.06 "beta" multiplier from the proxy group, resulting in an estimated industry risk premium of between .30 percent and .42 percent.

The PUC found the evidence speculative and unconvincing for the following reasons: "Applicants offer no basis for comparing their selected proxy group to their particular circumstances, making any conclusion from the analysis done on the proxy group speculative. Thus, while the proxy group selected by Applicants may have an average beta of 1.06, Applicants failed to show how the risks faced by the proxy group correspond to the Applicants, why only five companies were selected from the industry code for the proxy group, or how the returns on investment for the Applicants correspond to the proxy group. Accordingly, Applicants failed to carry their burden to justify the addition of an industry-specific premium to the cost of equity calculation." (Fns. omitted.)

We agree with the PUC's assessment of the deficiencies of the evidence. Moreover, the PUC reiterated the reasons mentioned in the small size analysis for concluding this additional risk premium does not appear to be necessary in this case. On balance, we conclude the PUC's decision declining to apply an additional risk premium based on the specific industry was, on this record, a reasonable one.

C.  Alleged Regulatory Risk Premium

Petitioners also sought the adoption of a risk premium of at least 2 percent to the cost of equity based on regulatory risk, which was requested in the event the size premium was denied.  According to Balhoff, a regulatory risk exists regarding these small and vulnerable carriers that are dependent on support mechanisms such as CHCF-A program funding and federal high-cost USF funding.  He stated this dependence on revenue support programs creates uncertainty in the current legal environment where the FCC has adopted ongoing regulatory reforms and where corresponding reforms of the PUC regulations implementing the CHCF-A program are also being considered.  Such uncertainty was assertedly a matter of concern to investors.  For example, changes at the federal level (initiated in 2011) included a phase down of certain access charges over nine years as well as caps on certain operating expenses.  Balhoff noted the PUC has "adopted a rebuttable presumption that Independent Small LEC's revenue requirements could not include corporate expenses beyond the levels applicable to federal support mechanisms," thereby placing a limitation on the use of CHCF-A funding.

ORA, in its reply brief filed in the PUC proceedings, responded to the identical contentions that the regulatory reforms created a "regulatory risk" increasing the cost of equity.  It stated:  "For example, they cite to a 'phase-down of interstate and intrastate access charges over a period of nine years'; however, any shortcomings in revenue have been and will continue to be met by the [CHCF-]A-Fund.  They cite to 'new broadband deployment standards that must be met'; but the [CHCF-]A-Fund specifically provides that these broadband infrastructure improvements will be put into rate base.  They cite to a 'new cap on corporate operations expenses'; however, the cap has been found by both the Commission and the FCC to be reasonable and necessary because of carriers' inclusion of unreasonable expenses in ratemaking forecasts.  They cite to the reduction of 'Safety Net Additive and Local Switching Support mechanisms'; but again, any shortfalls in revenue as a result will be covered by the [CHCF-]A-Fund.  [¶]  Even assuming that

31.

these perceived 'risks' constituted an actual threat to revenues, which they do not, the carriers have maintained a healthy average return on equity of 11.973%, and have never been turned down on any loan application by the RUS or any other lender. It is clear that these 'risks' are merely imagined for the sake of producing higher returns than necessary."

Petitioners have a more limited view of the overall impact of the CHCF-A program to mitigate risk. As Balhoff noted, each company's CHCF-A revenue is set in its most recent rate case, and that annual funding level remains effective until the company's next rate case, subject only to limited annual adjustments based on specific factors prescribed in the CHCF-A rules. He noted further that an annual adjustment to CHCF-A funding levels can be made where the federal support component was less than forecasted, or for revenue impacts of regulatory changes of industry-wide effect that alter the assumptions upon which the PUC set the company's rate structure in a rate case.

In response to petitioners' regulatory risk claim, the PUC decision held as follows: "Applicants have not offered persuasive evidence explaining how any of the alleged regulatory risks are not already adequately addressed through other regulatory means." Judging from its entire analysis of proposed risk premia in the PUC decision, the reference to "other regulatory means" clearly included the CHCF-A program. In its brief filed with this court, the PUC elaborated that other regulatory means (besides CHCF-A program support) would include the right to apply for interim rate relief.

Further, despite petitioners' abstract claim of regulatory uncertainty, we note there is nothing in the record to indicate that the CHCF-A program has ceased to be an ongoing legislative or regulatory commitment. (See, § 275.6, subd. (g).) Thus, as the PUC put it, while the CHCF-A program does not eliminate all risk to the Small LECs, "the presence of [its] subsidies mitigates the business risk these companies face." This conclusion was inferentially supported by ORA's report discussing risk premia generally, ORA's expert's testimony on regulatory risk, and by the PUC's agency expertise on the

32.

operation of the CHCF-A program. In this connection, the presence of such countervailing factors may properly be considered. (*Duquesne*, *supra*, 488 U.S. at p. 314.)

The PUC's response to the purported regulatory risk claimed by petitioners was reasonable based on evidence in the record and on its understanding of the CHCF-A program and interim rate relief. On this record, petitioners have failed to meet their burden of demonstrating that these other regulatory means (i.e., the CHCF-A program funding and interim rate relief), as asserted by ORA and the PUC, would not address the identified regulatory risks. Additionally, for the reasons indicated in our discussion of small company size, the PUC had reason to believe, based on the record, that the cost of equity it assigned was within the reasonable range without the application of additional risk premia. Therefore, the PUC did not err in refusing to adopt a regulatory risk premium.

## **DISPOSITION**

The California Public Utilities Commission's decision Nos. 16-12-035 and 17-12-029 are affirmed. Respondent is awarded its costs on appeal.

_____

SNAUFFER, J.

WE CONCUR:

_____

FRANSON, Acting P.J.

_____

SMITH, J.

**<u>CERTIFIED FOR PUBLICATION</u>**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PONDEROSA TELEPHONE CO., et al.,<br><br>    Petitioners,<br><br>       v.<br><br>CALIFORNIA PUBLIC UTILITIES COMMISSION,<br><br>    Respondent. | F076845<br><br>(CPUC Decision Nos. 16-12-035 & 17-12-029)<br><br>**ORDER GRANTING REQUEST FOR PUBLICATION** |

On June 24, 2019, the Court received and filed Respondent's request for publication of the nonpublished opinion filed on June 18, 2019 in the above entitled matter. In that the opinion meets the standards for publication specified in the California Rules of Court, rule 8.1105(c), it is ordered that the opinion be certified for publication in the Official Reports.

_____
SNAUFFER, J.

WE CONCUR:

_____
FRANSON, Acting P.J.

_____
SMITH, J.

34.